COMMONWEALTH *vs.* ALBERT FORD, JR.

No. 92-P-1289.

Middlesex. October 13, 1993. - January 13, 1994.

Present: DREBEN, KAPLAN, & LAURENCE, JJ

*Search and Seizure*, Motor vehicle, Exigent circumstances, Arrest. *Practice, Criminal*, Instructions to jury, Lesser included offense, Plea, Sentence, Presence of defendant. *Judge. Jury and Jurors.*

A warrantless search by police of the van being driven by a criminal defendant at the time of his arrest, which led to the discovery and seizure of evidence was based on probable cause to believe that evidence of crime would be found in the van and was justified by exigent circumstances, as well as being a search incident to a lawful arrest. [755-756]

At the trial of an indictment for armed robbery, the judge correctly declined to give a requested jury instruction as to the lesser included offense of larceny from the person, where neither the prosecution's nor the defendant's theory of the case raised any possibility of a finding of the lesser crime. [756-757]

A judge's remarks during a pretrial discussion at sidebar concerning a defendant's possible plea of guilty did not give rise to a presumption that the judge was biased [757-758], nor was the sentence imposed after a trial by jury so severe as to indicate vindictiveness [758].

A criminal defendant was not entitled to be present during the computer-assisted procedures for random assembly of jury panels pursuant to G. L. c. 234A. [759]

INDICTMENTS found and returned in the Superior Court Department on February 20, 1991.

A pretrial motion to suppress evidence was heard by *Guy Volterra*, J., and the cases were tried before him.

*Russell C. Sobelman* for the defendant.

*Lincoln S. Jalelian*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. After trial by jury in Superior Court, Middlesex County, the defendant Albert Ford, Jr., was convicted of the crimes of armed robbery and unlawful carrying of a fire-

arm. He appeals the convictions on the grounds set out and examined below.

The jury could find the following. In the afternoon of January 17, 1991, Mark LeRoux and Stephen McGowan, who worked for the "Superior Sound" company, were driving in Malden in a company-owned van loaded with boxes containing seven pairs of stereo speakers. They had been trying to sell the speakers from their van to any persons they could attract: the arrangement was that they had to return to the company $175 for each set sold and would retain as a commission any amount in excess they received from a buyer.

About 2:30 P.M., they stopped at a red light off route 60. Alongside was a small, blue-gray van. McGowan put his head out his window and asked the driver (ultimately the defendant) whether he could use a speaker for his home. When the defendant showed interest and asked to see the speakers, the two vans went off the road, and apparently the defendant was shown a set and a brochure. A deal evolved that the defendant would pay $2,000 for the lot; he said the men should follow him to a place where he could obtain the money. Accordingly, LeRoux and McGowan followed the defendant to the driveway of a house at 240 Ferry Street, Malden.

The defendant went into the house and returned five minutes later with a man, Robert Nolan. Approaching LeRoux and McGowan, the defendant pulled a gun from the pocket of his gray jacket, said in effect that, as they had stolen the speakers, he would steal the speakers from them, and ordered them to help load the boxes into his van. When the boxes were unloaded, the defendant warned the men against returning to the house or going to the police.

LeRoux and McGowan drove off. LeRoux wrote down the license number of the defendant's van, Mass. 920-FJG. They went direct to the Malden police station and talked to Officer Robert Lewis. LeRoux with Officer John Rivers and other officers returned to Ferry Street. A radio report now indicated that the van driven by the defendant was rented from a certain agency; a person had just called the agency to say that he would be coming there shortly to exchange the van

for a larger vehicle. LeRoux with Officers Rivers and Coye proceeded in an unmarked cruiser about a mile and a half to the agency's parking lot, some three or four car lengths off Eastern Avenue.

Waiting there, they soon saw a van traveling eastward on Eastern Avenue in the direction of the agency. LeRoux identified the van as the defendant's, the defendant as the driver (there was also a passenger), and the boxes, seen through the side windows of the van, as the stolen boxes. As the van passed by the agency location, the cruiser was steered into the avenue traffic and, at a red light at Eastern Avenue and Maplewood Street, was positioned right behind the defendant's van. When the lights changed, the cruiser managed to swerve ahead of the van, blocking it. Within minutes other police vehicles arrived to block the van's rear. Officer Rivers with gun drawn went to the driver's side of the van, ordered the defendant out (Rivers recognized the defendant as "Junior Ford"), patted him down, and handcuffed him. Officer Coye similarly handled the passenger, Richard McCoy (later cleared of criminal involvement by police investigation).

In the van, hung over the driver's seat back, was a black jacket, and over the passenger's seat back, a gray jacket. LeRoux said to Rivers that there might or would or should be a gun in the gray jacket, that being the jacket to which the defendant had returned his gun at Ferry Street. Rivers examined the black jacket: no gun. From the front left side pocket of the gray hooded jacket he withdrew a .38 caliber handgun, matching LeRoux's earlier description as to color.

Upon the foregoing evidence (various details are omitted)[1] the judge denied the defendant's motion for a required finding of not guilty.

The defendant testified in his own behalf. He said McGowan asked him whether he was interested in "hot" stereo speakers; he said no, but when the men explained that they had not stolen the speakers from a stranger but had taken

---

[1]Testifying for the prosecution were LeRoux, McGowan, Lewis, Rivers, McCoy, Dimitri Getteny, and Ronald Romeo (as to the latter two, see *infra* notes 2 and 3.

them stealthily from their company and hidden them and were now selling them on their own, the defendant was willing to do business.[2] At Ferry Street, while LeRoux and McGowan were waiting outside, he had gone upstairs, he said, and borrowed $2,000 from "pappy" John Sullivan, a loan shark, who lived on the third floor. He paid the money over to the men outside and received the boxes, Nolan, a friend, assisting. The van he had borrowed from a friend, Dimitri Getteny.[3] He denied having or using a gun or stealing the boxes. The black jacket was his, not the grey. The episode through his receiving the goods occurred during a break for lunch in his job as a Department of Public Works employee; he had returned to the job and then given a lift to his co-worker McCoy along Eastern Avenue. He said he was intending to sell some of the speakers and to give the rest away as (delayed?) Christmas presents.

A renewed motion for a finding was denied (indeed the defendant was badly shaken on cross-examination and redirect was not attempted).

The jury returned verdicts of guilty of the offenses charged and judgments of conviction followed.

1. *Pretrial suppression motion.* The defendant moved pretrial to suppress the gun (and the speakers as represented in photographs). At the hearing, the prosecutor called Officer Rivers and Mark LeRoux. It is needless to rehearse their testimony in detail; it will be enough to say that it corresponded in substance to the evidence received at trial, recounted above. Rivers was told at the police station and at Ferry Street of the circumstances of the robbery; received the radio report about the van rental; heard LeRoux at the agency parking lot identify the van, contents, and driver as the van passed on Eastern Avenue; and participated in the pursuit

---

[2]Officer Rivers testified that it appeared from police investigation that the "Standard Sound" company bought their speakers legitimately. Testimony by Roland Romeo, a principal of the company, was to like effect. The defense intimated in closing argument to the jury that the method of the company's commission salesmen was to say or hint that the speakers were hot.

[3]Getteny, called by the prosecution, confirmed the borrowing.

and blocking of the van and the arrests and search and seizure that followed. LeRoux indicated the gun might be found in the jacket. LeRoux's own testimony concerned chiefly his observation of the gun and jacket during the robbery.

The defense conceded at the hearing that the police at the time of the arrests had probable cause to believe that the defendant had committed an armed robbery. We add, and the judge found, that they had probable cause to believe that evidence of the crime — the boxes and the gun (not found on the defendant's person) would be found in the van. This justified a corresponding search. See *Commonwealth* v. *Harding*, 27 Mass. App. Ct. 430, 438 (1989), citing *Commonwealth* v. *Brillante*, 399. Mass. 152, 155 n.6 (1987). If "exigent circumstances" were needed to excuse the lack of a warrant, they were surely present when account is taken of the fact that a motor vehicle was involved; moreover, there was but a short interval between the armed robbery and the arrests, probably less than two hours.

So also the search was justified as incident to the arrest of the defendant, as occupant of the van. See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 351 (1983), referring to *New York* v. *Belton*, 453 U.S. 454, 460 (1981).[4]

2. *Lesser included offense.* The defendant requested a jury instruction that, if the jury found the defendant not guilty of the charge of armed robbery, they could consider a finding on the "lesser included" offense of larceny from the person. The judge declined such an instruction, and correctly so. For neither the prosecutor's theory of what occurred nor the defendant's theory raised any possibility of a finding of the lesser crime: the prosecution contended that the defendant

---

[4]The trial commenced on the day following the suppression hearing, and we find defense counsel at that time lamenting the absence of a transcript of the hearing to assist him in cross-examining Officer Rivers. Apart from the difficulty that might be expected in preparing the transcript in time, we note that counsel could rely not only on fresh memory but also on notes he had evidently taken at the hearing, and that a reading of counsel's cross-examination of the officer does not suggest that he was unduly handicapped.

stole the speakers at gunpoint; the defendant contended that he paid for the speakers in cash and received them in a consensual sale; there was no intimation that the defendant stole the speakers but without use of a weapon. The defendant's counsel did try to raise doubts whether the gun retrieved was the defendant's, but that was part of the theory of a voluntary cash sale. "A judge is required to charge the jury concerning lesser included offenses if the evidence provides a rational basis for acquitting the defendant of the crime charged and convicting him of the lesser included offense." *Commonwealth* v. *Egerton*, 396 Mass. 499, 503 (1986), quoting from *Commonwealth* v. *Santo*, 375 Mass. 299, 305 (1978). See also *Commonwealth* v. *Thayer*, *ante* 599, 602 (1993). The condition was not met here.[5]

3. *Conversation about guilty plea.* In conversation with the prosecutor and defense counsel at sidebar just before jury impanelment, it appeared that the defendant had violated parole on a previous conviction (the balance of the sentence to be served was four years). The judge said the defendant had a "wicked" record and that trying him would be "a waste of time," "an academic exercise." In case of a guilty plea, the judge suggested the defendant might draw a sentence of "twelve years or something" from and after, whereas he would "probably get twenty to forty" if he went "the distance." The judge said he wasn't "twisting any arms" and had "nothing better to do than try this case." The defendant did not plead.

Judges have been admonished "not to participate as active negotiators in plea bargaining discussions." *Commonwealth* v. *Gordon*, 410 Mass. 498, 501 n.3 (1991). The fact, however, that a judge oversteps the line does not mean that a judgment after trial must be vacated for presumptive bias on the part of the judge. As to proof of actual bias in the pres-

---

[5]Although he did not object at the time, the defendant now criticizes the judge's remarks to the jury about the role of the grand jury and the meaning of an indictment. Upon study, we find no fault with the instruction. The defendant cites *Commonwealth* v. *Delaney*, 8 Mass. App. Ct. 406, 408-409 (1979), but the charge held bad there was quite different from the present text.

ent case, the defendant cannot specify any behavior by the judge in the course of trial that bespeaks it.

It would be a basis for vacating the judgment that the sentence finally imposed was so harsh as to indicate vindictiveness — a penalty on the defendant for declining the judge's proposal. The fact that the sentence, here fifteen to twenty years from and after, exceeded the one suggested by the judge for a plea, does not establish a "reasonable likelihood" of "vindictiveness," even where, as here, the judge stated ahead of time that a higher sentence would probably be meted out if the case went to trial. See *Commonwealth* v. *Ravenell*, 415 Mass. 191, 194-195 (1993). After all, a plea bargain regularly implies a lenient sentence. See *Commonwealth* v. *Johnson*, 27 Mass. App. Ct. 746, 750-751 (1989). We look to a set of factors on the issue of vindictiveness, see *Commonwealth* v. *Johnson*, 27 Mass. App. Ct. at 751-752: evidence of pressure on the defendant to accept a plea or of the judge's displeasure in the defendant's refusal of the offer; the severity of the sentence in relation to the sentence authorized by statute, here life imprisonment; and the Commonwealth's recommended sentence, here twenty-five to thirty-five years.[6]

We conclude that the defendant was not unfairly tried or vindictively sentenced.

4. *Jury selection.* According to G. L. c. 234A, the statute applicable to Middlesex (and other counties as designated), the jury commissioner prepares a master jury list for the judicial district (usually the county) and causes it to be randomly shuffled (§ 16). The clerk of each court informs the commissioner of the number of jurors required for service (§ 17), and the commissioner summons jurors in sequence from the shuffled master jury list (§ 16). In advance of the scheduled appearance of jurors, the commissioner sends to the clerk of court a list of the jurors expected to appear, with certain information about each; the list is available for in-

---

[6]On the firearm charge, the judge sentenced the defendant to a term of four to five years to be served concurrently with the sentence for armed robbery. A second charge of armed robbery was placed on file.

spection by parties, counsel, and others (§67). In the present case[7] on the particular day at Middlesex courthouse, there were about 150 jurors whose names had been assigned by computer to panels of sixteen or so; the panels and the individuals in each were numbered in sequence, thus 1-1. . ., 2-1. . . . Panels totalling some ninety-one jurors were sent to courtroom 10B (where the defendant was tried), the rest to courtroom 8.

The defendant's attacks on jury selection having any plausibility, as far as we can make them out, can be stated as follows.

(a) Just before jury impanelment, counsel moved orally to dismiss the indictments[8] evidently because the defendant was not present at the making up of the panels. The defendant is entitled to be present at "all critical stages" of the proceedings in any criminal prosecution, Mass.R.Crim.P. 18(a), 378 Mass. 887 (1979), but this can hardly extend to an administrative step in a randomized process, with the panels themselves being made up by computer. At all events, "the defendant is unable to show that he was prejudiced in any way by his absence." *Commonwealth* v. *Fanelli*, 412 Mass. 497, 501 (1992).

(b) The defendant points to § 25 of G. L. c. 234 which calls for a certain described shaking of ballots by the clerk in open court. As the judge indicated in memorandum, this provision of the older statute, c. 234, is out of line with the procedures of c. 234A now governing Middlesex.[9]

---

[7]A person from the jury commissioner's office in the courthouse testified about the process.

[8]The Commonwealth points out that a motion to dismiss was irregular; if successful, the motion would result only in a new jury selection.

[9]A written motion attacking jury selection was presented on the day after impanelment and thus appears untimely (see G. L. c. 234A, § 73; Mass.R.Crim.P. 20[a], 378 Mass. 889 [1979]), as the judge apparently recognized. The defendant argues that the motion was merely a continuation of the oral motion, but the record looks otherwise. Although the defendant was represented by counsel, the writing here was prepared by a prison inmate and made general charges about discrimination, not properly supported.

There is no cognizable claim that the jury that heard the present case was contaminated. The defense and prosecution said at impanelment they were content.

*Judgments affirmed.*