## STATE OF CONNECTICUT *v.* LOUIS D'ANTONIO
### (SC 17096)
### (SC 17095)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.[1]

---

[1] These cases originally were argued before a panel of this court consisting of Chief Justice Sullivan and Justices Norcott, Katz, Vertefeuille and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the cases be considered en banc. Accordingly, Justices Borden and Palmer were added to the panel, and they have read the records and briefs, as well as the transcripts of the oral arguments.

Argued March 15—officially released August 2, 2005

*Ronald G. Weller*, assistant state's attorney, with whom, on the brief, were *Timothy J. Liston*, state's attorney, *Barbara Hoffman*, senior assistant state's attorney, and *George Ferko*, former senior assistant state's attorney, for the appellant (state).

*Adele V. Patterson*, assistant public defender, for the appellee (defendant).

*Opinion*

NORCOTT, J. This court, in *State* v. *Niblack*, 220 Conn. 270, 280, 596 A.2d 407 (1991), approved of a

procedure whereby a trial court may participate in the negotiation of a plea agreement between the state and a defendant, so long as a different judge presides at trial and sentencing if the negotiations are unsuccessful (*Niblack* rule). The principal issue in these certified appeals is whether the Appellate Court properly concluded that violation of the *Niblack* rule is, by itself, plain error that requires reversal of a defendant's conviction, without regard to the facts and circumstances of a particular case. The state appeals, upon our granting of its petitions for certification,[2] from the judgments of the Appellate Court reversing the judgments of the trial court, which: (1) found the defendant, Louis D'Antonio, to be in violation of his probation pursuant to General Statutes § 53a-32; *State* v. *D'Antonio*, 79 Conn. App. 683, 691, 830 A.2d 1187 (2003) (*D'Antonio I*); and (2) convicted the defendant after a jury trial of criminal trespass in the first degree in violation of General Statutes § 53a-107 (a) (1), and two counts of interfering with an officer in violation of General Statutes § 53a-167a (a). *State* v. *D'Antonio*, 79 Conn. App. 696, 830 A.2d 1196 (2003) (*D'Antonio II*). We conclude that, under the facts and circumstances of this case, the trial court's presiding at the hearing, trial and sentencing of the defendant after it had participated in plea negotiations, although improper, was not plain error requiring rever-

---

[2] In appeal Docket No. SC 17095, we granted the state's petition for certification limited to the following issue: "Did the Appellate Court properly reverse the judgment of violation of probation and the ensuing imposition of sentence on the basis of plain error?" *State* v. *D'Antonio*, 266 Conn. 930, 837 A.2d 803 (2003).

In appeal Docket No. SC 17096, we granted the state's petition for certification limited to the following issue: "Did the Appellate Court properly reverse the judgments of conviction on the basis of plain error?" *State* v. *D'Antonio*, 266 Conn. 930, 837 A.2d 803 (2003).

The appeals were briefed separately, but were argued together before this court. We have consolidated them for resolution because they raise the same legal issue and arise from a common factual and procedural background.

sal. Accordingly, we reverse the judgments of the Appellate Court.

The records and the Appellate Court decisions reveal the following facts and procedural history. "On October 24, 2000, the defendant, through his public defender, pleaded nolo contendere to two separate charges of operating under the influence on two separate occasions in violation of General Statutes § 14-227a and was sentenced by the court [*Clifford, J.*] to a total effective term of thirty months of imprisonment, execution suspended after twenty-four months, and one year of probation with special conditions.[3] The special conditions of the defendant's probation were the same with respect to both violations and included, inter alia, substance abuse screening, evaluation and treatment as recommended by the probation officer, a total of 200 hours of community service and no operation of a motor vehicle while the defendant's operator's license was under suspension.

"On or about October 4, 2001, the defendant was released from prison and began serving his probation. After the defendant refused to participate in an alcohol treatment program, his probation officer applied for arrest warrants for violation of probation on December 10, 2001. On December 11, 2001, the defendant was arraigned on two criminal matters, criminal trespass in the first degree and interfering with an officer, respectively, and the court appointed a public defender as his counsel. On December 18, 2001, the defendant was arraigned on the violation of probation matters and denials were entered. At that time, the court appointed the public defender who was handling the defendant's criminal matters to represent him in the violation of

---

[3] "On the same date, the defendant also pleaded nolo contendere to one count of disorderly conduct in violation of General Statutes § 53a-182 and was sentenced to sixty days imprisonment, running concurrently with the sentence for the motor vehicle offenses." *D'Antonio I*, supra, 79 Conn. App. 685 n.2.

probation matters. Thereafter, the court held several scheduled proceedings, often involving both the criminal and the violation of probation matters.

"On January 15, 2002, the defendant appeared in court with his counsel and indicated that he wanted to represent himself. The court [*Gordon, J.*] told the defendant that before allowing him to represent himself, it was going to order a competency examination. On February 27, 2002, when the defendant appeared in court with his counsel, the court, *Fischer, J.*, made an uncontested finding of competency based on the competency report in the file. Again, the defendant raised the issue of self-representation. The court, *Fischer, J.*, allowed the defendant's counsel to withdraw from the violation of probation and criminal cases, and, on the same date, the defendant filed a pro se appearance in those cases. On March 20, 2002, the court, *Clifford, J.*, the prosecutor and the defendant engaged in an on the record plea discussion. The defendant refused any offered plea bargain and insisted on exercising his 'right for a trial.'[4]

---

[4] *We set forth the contents of the plea discussion in their entirety:*

"The Court: Who's this now?

"[The Prosecutor]: This is Louis D'Antonio, Your Honor. This matter—I called it earlier. We had at least discussed it. I did check with probation. It is not consecutive. It was a concurrent sentence, so. I just wanted to be sure. He owes six months.

"The Court: You representing yourself, sir?

"[The Defendant]: Yes, sir, I am.

"The Court: It's never a smart move. I'm the one who sentenced you originally, right? You've got [thirty] months, suspended after [twenty-four] months, correct? You've got two [violation of probations] which basically you owe six months on that. You've got a trespass one where you can get up to a year; interfering you can get up to a year. Your exposure is two and a half years. You understand that?

"[The Defendant]: Yes. I understand that.

"The Court: Is there any kind of offer from the state on these?

"[The Prosecutor]: Prior to the [violation of probation], one year execution suspended, six months on the criminal trespass.

"The Court: One year what? Suspended sentence?

"[The Prosecutor]: It was six months and—one year after six months. And then there was no offer on the interfering and the [violation of probations].

"The Court: But if it was known he was on probation, would the offer still be like a year after six months if he was interested in that? I don't know if you are.

"On April 3, 2002, the defendant again appeared before Judge Clifford for the violation of probation hear-

"[The Defendant]: I had written a letter to the public defender in January that I wanted a speedy trial motion filed. I've tried to get papers in Hartford County.

"The Court: You are really not eligible. Are you serving a sentence now?

"[The Defendant]: No, I'm not serving a sentence.

"The Court: You're not eligible for a speedy trial until you've been incarcerated for eight months. Let me just say this, sir. I know you are representing yourself. You know, violation of probation, with all due respect, you don't—they're not that hard to prove. You do something on probation, they violate the terms of it, that's six months right there.

"[The Defendant]: I'm entitled to a hearing, I'm sure of that.

"The Court: Listen. I'm trying to help you. Okay. What I'm trying to tell you, it's not hard to prove those. You go to a hearing on that—you know, it's not that difficult. You're not even in front of a jury. It's in front of a judge. If the judge finds you in violation, bingo, you've got six months. The offer is a year after six months.

"[The Defendant]: I got three months in right now, sir.

"The Court: That's good.

"[The Defendant]: Well, at the time of the arrest the police removed $500 from my front pocket which would have been bond money for that particular—

"The Court: You're not hearing me. You are going to hurt yourself. You're not hearing me.

"[The Defendant]: I'm not giving up my right for a trial.

"The Court: Listen. You can have your right to a trial. I'm just trying to tell you to use some common sense. Okay. You've already got a lot of time. If you want to have your trial, you can end up doing two and a half years. You owe six months on the probation. The offer is six months in jail. You've got three months in.

"[The Defendant]: That was only on the [violation of probation] offer—files. Sir, that wasn't on the criminal trespass.

"The Court: It's on something right now, a year after six months. That's a good offer.

"[The Defendant]: I'm not pleading guilty to it because—

"The Court: Listen. I could care less if you go to trial and get the maximum. I'm just trying to do this for you. If you want to have a trial, go ahead. I could care less.

"[The Defendant]: Well, Your Honor, it's not nothing to me.

"The Court: I'm just trying to help you out, pal. I could care less. You don't want to listen to me, go ahead we'll put you down for trial.

"[The Defendant]: The warrant was signed because of a valid restraining order which was one year and eight months old. Restraining orders last for six months.

"The Court: You're wrong, but that's all right. I mean—

"[The Defendant]: You're the guy who sentenced me and you ordered—you said that there's no contact being ordered on the day of your sentencing.

ing. Although Judge Clifford recalled having some discussion with the defendant previously in the case, he proceeded to canvass the defendant on the issue of self-representation and advised the defendant of, inter alia, the state's burden of proof in the case and the defendant's various constitutional rights. The defendant

I have the report right in my files right there.

"The Court: Fine. You know more than me. That is fine. You're not going to be in front of me. I guess we should schedule it for a hearing. You represent yourself. And, listen, I did my best to try to help you out. If it doesn't work out, it doesn't work out. Nothing off me. I could care less.

"[The Defendant]: I know article [sixth] of the constitution you took an oath to make sure that you abide by the rules of the constitution.

"The Court: I'm out of this. I'm trying to help you work the case to your benefit. You want your trial, you get all your rights—all the rights you want and the judge can sentence you to whatever he or she wants.

"[The Defendant]: Yup.

"The Court: That's what you've got to be careful of.

"[The Defendant]: Also being held right now on all cases, all files on bond.

"The Court: Excellent point. I don't know what it means. Put this over for a hearing then.

"[The Prosecutor]: We can put the [violation of probation] down for a hearing. Start there. The other two cases—start there. If we lose that or win that, fine, move on to the trial. Start with the [violation of probation].

"The Court: When do you want to have a hearing?

"[The Defendant]: As soon as possible.

"The Court: All right. Let's schedule—I will have to put it in front of another judge because I'm not going to handle it. Doesn't matter to me. I've got to find a day that another judge is going to be available to hear it. Why don't I go two weeks from today? Can you tell—April 3rd. And tell case flow to put it down at 2 o'clock.

"[The Defendant]: 2 o'clock.

"The Court: All right. Thank you, sir.

"[The Defendant]: Excuse me. Next time I appear in court, could you order these sheriffs to unhandcuff me in the front so that—while I'm representing myself.

"The Court: If you're representing yourself, don't worry about that. We'll take care of that. That is not a problem.

"[The Defendant]: Very good.

"[The Prosecutor]: One issue was raised by the probation intake person. I didn't specifically ask for an [alternate incarceration program pursuant to General Statutes § 53a-39a]. I don't know if the court wants an [alternate incarceration program]. Obviously, you're going—

"The Court: Put an [alternate incarceration program] on that, § 53a-39a.

"[The Prosecutor]: Yes, thank you, Your Honor."

indicated that he was 'prepared to continue' and to 'go forward,' and there was no mention by anyone of Judge Clifford's recusal. Thereafter, the hearing commenced and concluded, and Judge Clifford found that the defendant did violate a condition of his probation and that the beneficial aspects of probation were no longer being served. Judge Clifford sentenced the defendant to the remaining six months of imprisonment previously suspended on the sentence for the underlying motor vehicle offenses." *D'Antonio I*, supra, 79 Conn. App. 685–89. Additional facts concerning the violation of probation hearing will be discussed in part I C of this opinion.

"At the conclusion of the sentencing phase of the violation of probation hearing, there was a brief on the record discussion of the defendant's pending criminal trespass and interfering cases. Judge Clifford again briefly canvassed the defendant on the issue of self-representation and appointed standby counsel to assist the defendant in the trial of the charges of criminal trespass in the first degree and interfering with an officer. On June 10, 2002, Judge Clifford granted the state's motion to consolidate those cases for trial. On the same date, during a discussion about whether Judge Clifford had signed an arrest warrant in the case, Judge Clifford asked the defendant, 'Do you have a problem with me sitting on [this case?]' The defendant responded that he had '[n]o objection.'

"Thereafter, following jury selection on June 12, 2002, the case proceeded to trial before Judge Clifford on June 12, 13, 14 and 18, 2002. During trial, there was no mention by anyone of Judge Clifford's recusal. On June 18, 2002, the jury returned a guilty verdict on one count of criminal trespass in the first degree in violation of § 53a-107 (a) (1) and two counts of interfering with an officer in violation of § 53a-167a (a). Judge Clifford then sentenced the defendant to a total effective term of two years imprisonment, execution suspended after twenty

months, with three years of probation." *D'Antonio II,* supra, 79 Conn. App. 702–703. Additional facts concerning the criminal jury trial will be discussed in part I D of this opinion.

The defendant filed timely appeals to the Appellate Court from the judgments of the trial court with respect to the judgments of conviction and probation violation. The Appellate Court reversed the judgments in the cases in two separate opinions, concluding that, notwithstanding the defendant's failure to move for recusal at trial, it was plain error for Judge Clifford to preside over the probation violation hearing and criminal trial after having participated in plea bargaining on the same charges on March 20, 2002, in violation of the *Niblack* rule. *D'Antonio I,* supra, 79 Conn. App. 693–94; *D'Antonio II,* supra, 79 Conn. App. 707. The Appellate Court relied on its decisions in *State* v. *Falcon,* 68 Conn. App. 884, 793 A.2d 274, cert. denied, 260 Conn. 924, 797 A.2d 521 (2002), and *State* v. *Washington,* 39 Conn. App. 175, 664 A.2d 1153 (1995), and reasoned that a new hearing and a new trial were required because "the existence of impartiality might reasonably be questioned and the fairness and integrity of and public confidence in the judicial proceeding affected when a court presides over the violation of probation hearing after having participated actively in plea negotiations. In this case, the appearance of a fair trial has been lost and a new revocation of probation hearing is warranted." *D'Antonio I,* supra, 696; see also *D'Antonio II,* supra, 710 (same conclusion for trial and sentencing in criminal matter). Thereafter, we granted the state's petitions for certification; see footnote 2 of this opinion; and these appeals followed.

On appeal, the state claims that the Appellate Court improperly reversed the judgments of the trial court on the basis of plain error because: (1) the defendant's claims with respect to the trial court's failure to recuse

itself are unreviewable because he waived them by failing to raise them pursuant to General Statutes § 51-39 (c)[5] before the trial court in a Practice Book § 1-23[6] disqualification motion; and (2) the records in both the probation violation and criminal proceedings demonstrate that there was no actual bias on the part of the trial court, and that the impropriety was harmless because it did not affect the results of the proceedings. In response, the defendant argues that the Appellate Court properly: (1) reviewed the proceedings for plain error because "judicial neutrality is a core value of our judicial system"; and (2) concluded that it was plain error for the trial court to preside because it is the potential appearance of partiality that requires the trial court to recuse itself after unsuccessful plea bargaining. The defendant also posits two alternate grounds for affirming the judgment of the Appellate Court, namely, that: (1) the trial court's presiding over the hearing and trial was a constitutional due process violation reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); and (2) the February 27, 2002 canvass of the defendant by the trial court, *Fischer, J.*, did not establish that the defendant made a knowing and intelligent waiver of his right to counsel before he proceeded pro se during plea bargaining, the probation violation hearing and the criminal jury trial. Finally, the defendant also claims that his two interfering with an officer convictions violate federal and state constitutional protections against double jeopardy because they are for the same offense.

---

[5] General Statutes § 51-39 (c) provides: "When any judge or family support magistrate is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court."

[6] Practice Book § 1-23 provides: "A motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. The motion shall be filed no less than ten days before the time the case is called for trial or hearing, unless good cause is shown for failure to file within such time."

We begin with the standard of review applicable to the defendant's plea bargaining claims, which were not raised before the trial court. "A claim that a judge should not have participated in plea negotiations, based solely upon the appearance of partiality, does not rise to the level of a constitutional violation." *Safford* v. *Warden*, 223 Conn. 180, 190–91, 612 A.2d 1161 (1992) (unpreserved claim that judge improperly had sentenced defendant after participating actively in plea negotiations based solely on appearance of partiality not constitutional violation for habeas corpus purposes). Accordingly, and as the Appellate Court properly recognized, review is unavailable under *State* v. *Golding*, supra, 213 Conn. 239–40, which is limited to constitutional claims. Review of the defendant's unpreserved claims must, therefore, be pursuant to the plain error doctrine, which "has been codified at Practice Book § 60-5, which provides in relevant part that [t]he court may reverse or modify the decision of the trial court if it determines . . . that the decision is . . . erroneous in law. . . . The plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 455–56, 862 A.2d 817 (2005).

## I

## WHETHER THE TRIAL COURT'S FAILURE TO RECUSE ITSELF FROM PRESIDING OVER THE DEFENDANT'S HEARING AND TRIALS CONSTITUTED PLAIN ERROR REQUIRING REVERSAL

### A

### Whether the Defendant's Failure to Raise His Recusal Claims Before the Trial Court Precludes Plain Error Reversal

We begin with the state's claim that the Appellate Court should not have determined whether the trial court's failure to recuse itself was reversible plain error because the defendant failed to raise his disqualification claims at trial. The state relies on General Statutes § 51-39 (c), and Practice Book § 1-23, which govern the disqualification of judges, as well as the Appellate Court's decision in *State* v. *Maluk*, 10 Conn. App. 422, 523 A.2d 928 (1987).

A judge must recuse herself or himself from a matter, either sua sponte or "upon motion of either party, if such judicial authority is disqualified from acting therein pursuant to Canon 3 (c) of the Code of Judicial Conduct . . . ."[7] Practice Book § 1-22 (a). It is undisputed that Practice Book § 1-23 governs motions for

---

[7] Canon 3 (c) of the Code of Judicial Conduct provides in relevant part: "(1) A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

"(A) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . .

"(C) the judge knows that he or she, individually or as a fiduciary, or his or her spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding . . . ."

judicial disqualification, and requires such motions to "be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. The motion shall be filed no less than ten days before the time the case is called for trial or hearing, unless good cause is shown for failure to file within such time."

These rules of practice must be read in conjunction with § 51-39 (c), which provides that, "[w]hen any judge or family support magistrate is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court." It is well settled that, in both civil and criminal cases, the failure "to raise the issue of the referee's disqualification either before or during the trial, can be construed as the functional equivalent of 'consent in open court . . . .' " *Timm* v. *Timm*, 195 Conn. 202, 205, 487 A.2d 191 (1985) (noting that record revealed no evidence of bias when trial judge failed to disqualify himself after conducting pretrial negotiations in court case); see also *State* v. *Fitzgerald*, 257 Conn. 106, 117, 777 A.2d 580 (2001) (noting that record revealed no evidence of bias and defendant's failure to object after improper disclosure of part B information was "tantamount to consent to the judge's participation in the case").

The state's arguments, however, sweep far too broadly and are dramatically at odds with the purpose of the plain error doctrine, which does not exist to permit reversals as the result of unpreserved technical errors, but rather to prevent the occurrence of "manifest injustice[s]" as the result of particularly "extraordinary" trial errors. (Internal quotation marks omitted.) *State* v. *Alston*, supra, 272 Conn. 456. We find instructive this court's decision in *Cameron* v. *Cameron*, 187 Conn. 163, 444 A.2d 915 (1982). In that case, an issue developed at trial about $4000 that the defendant allegedly had

failed to include in his financial affidavit. Id., 164. The defendant's attorney explained that the money had been deposited into a savings account, but the trial court demanded a deposit slip, stating that if one could not be produced, " 'either you or your client is in serious trouble in perpetrating or attempting to perpetrate a fraud upon this [c]ourt.' " Id., 164–65. The court ordered the defendant to appear the following morning, and made derogatory comments about the defendant's attorney and some of his prior clients, while stating "several times . . . that the defendant had lied under oath." Id., 165–66. The exchange continued the following morning when the trial court stated that it thought that the deposit slip that was produced had been " 'tampered with,' " and called the defendant to the witness stand, subsequently holding both the defendant and counsel in contempt of court; this judgment was vacated after counsel apologized. Id., 166–68. The defendant's attorney did not move for a mistrial or disqualification at any point.

On appeal, this court stated that, "[w]e would not ordinarily review on appeal a claim that a trial judge should have disqualified himself or declared a mistrial at a certain stage of the proceedings when no such request was made during the trial," but concluded that, "[w]e are dealing here, however, with an accusation of prejudice against a judge, 'which strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary.' " Id., 168. The court invoked the plain error rule, concluding that the trial court's conduct toward the defendant and counsel caused the appearance of partiality, and that "[i]t is quite evident from our review of the trial transcript that a serious departure from these high standards [of impartiality] occurred in the court below." Id., 169. The court stated that the trial court had expressed "a preconceived view of the credibility of a witness who had

not yet testified before the trier and of an attitude of skepticism concerning any person represented by his counsel [that] must have been devastating to the defendant and astounding to any observer schooled in the simple faith that the court is an instrument of justice." Id., 170. Noting that "[p]roof of actual bias is not required for disqualification," and that "[t]he appearance as well as the actuality of impartiality on the part of the trier is an essential ingredient of a fair trial," the court concluded that the "record in this case discloses a situation 'which inevitably raises in the minds of litigants . . . a suspicion as to the fairness of the court's administration of justice.' " Id., 170–71. Accordingly, the court concluded that the trial judge sua sponte should have ordered a mistrial, and vacated the judgment of the trial court. Id., 171; see *Bieluch* v. *Bieluch*, 199 Conn. 550, 553, 509 A.2d 8 (1986) (comparing *Cameron* and declining to consider disqualification claim not raised at trial when "nothing on the face of this record demonstrates such a miscarriage of justice as would warrant a finding of plain error in the trial judge's failure to recuse himself sua sponte");[8] see also *State* v. *Moore*, 65 Conn. App. 717, 728, 783 A.2d 1100 (declining to review unpreserved judicial bias claim based on court's conduct during trial when "[t]he defendant has made no claim of plain error in this case"), cert. denied, 258 Conn. 940, 786 A.2d 427 (2001); *State* v. *McDuffie*, 51 Conn. App. 210, 217, 721 A.2d 142 (1998) (concluding that trial court's pretrial statement about defendant before probation violation hearing "did not affect the fairness or integrity of the proceedings, nor did it result

---

[8] Cf. *State* v. *Santangelo*, 205 Conn. 578, 601–603, 534 A.2d 1175 (1987) (reviewing claim that trial court should have recused itself from sentencing after it received letter from detective "contain[ing] unsubstantiated, inflammatory comments and accusations concerning the defendant," despite defendant's failure to comply with applicable rules of practice requiring written disqualification motion before trial court).

in manifest injustice to the defendant"), cert. denied, 247 Conn. 958, 723 A.2d 814 (1999).[9]

Applying *Cameron* and its progeny, we conclude that the state's argument that these claims lay beyond the ambit of the plain error rule subverts the purpose of that doctrine, which exists to prevent "manifest injustices" that otherwise might occur without consideration of certain "extraordinary" unpreserved claims. (Internal quotation marks omitted.) *State* v. *Alston*, supra, 272 Conn. 456. Accordingly, we do not subject trial courts to reversal by ambuscade by reversing judgments on the basis of apparent judicial bias as manifested by genuinely egregious conduct, rather than technical violations of rules of practice. Accordingly, we now turn to the merits of the certified questions.

B

Whether Automatic Reversal is Required When a Trial Court Presides Over a Defendant's Trial After Having Participated in Plea Bargaining Negotiations

We now turn to the primary legal issue in these appeals, namely, whether it is per se plain error requiring reversal for a trial court to preside, in violation of the *Niblack* rule, over a defendant's trial after having participated actively in unsuccessful plea negotiations.

---

[9] The state's reliance on *State* v. *Maluk*, supra, 10 Conn. App. 422, is misplaced. In that case, the Appellate Court declined to review an unpreserved claim that the trial court should have recused itself from sentencing the defendant because it had participated in plea negotiations. Id., 424–25. Although the Appellate Court emphasized the defendant's failure to move for recusal in accordance with applicable rules of practice, the court also stated that the "record and transcript in this case dramatically illustrate the rational[e] behind Practice Book § 997 [now § 1-23]. The transcript does not indicate the degree, if any, to which [the judge] participated in any plea negotiations involving the defendant." Id., 425–26. The court stated that this inadequate record rendered appellate review impossible because "we have no way of determining whether the Judicial Code has been violated." Id., 426. The present case is distinguishable from *Maluk* because the record is adequate for review, as transcripts are available of all relevant proceedings.

The state claims that the Appellate Court misapplied the plain error doctrine because the record does not show any actual bias against the defendant on the part of Judge Clifford, and, therefore, his presiding at the probation violation hearing and criminal trial likely did not affect the results of those proceedings. The state contends specifically that we should follow the lead of the federal courts and apply the doctrine of harmless error to the defendant's claim that the trial court improperly presided after participating in plea negotiations. In response, the defendant argues that proof of actual bias is not required to mandate judicial disqualification and that per se reversal protects public confidence in the fairness of judicial proceedings and the conduct of justice.

Our inquiry about whether violation of the well established *Niblack* rule constitutes per se plain error begins with a review of the purposes of the rule. In *State* v. *Niblack*, supra, 220 Conn. 281, we rejected the defendant's attack on his guilty pleas to charges of murder, escape from custody and robbery, and concluded that the defendant failed to raise issues of constitutional magnitude requiring *Golding* review because "the available record fails to indicate that the participation of the judge who presided over and supervised the challenged plea negotiations coerced a plea from the defendant." We also "approve[d]" in dicta of the method followed by the trial court and the parties with respect to judicial court participation in the plea bargaining process, stating that, "[t]he plea negotiations involved an assistant state's attorney, defense counsel and eventually a judge who assisted the adversaries in reaching an agreement . . . . The judge was responsible for conducting plea negotiations and, if an agreement was reached, for holding a plea and sentencing hearing. If negotiations were not successful, however, a judge who was not involved in the plea negotiations would have presided at trial

and pronounced sentence if the defendant were found guilty." Id., 280.

In so concluding, we discussed the criticisms of active judicial participation in plea bargaining described in prior cases. In *State* v. *Gradzik*, 193 Conn. 35, 47, 475 A.2d 269 (1984), this court stated in dicta: "If the record revealed that the judge had been an active participant in negotiating the plea, we would view this claim differently. The dangers of such participation are obvious. In the first place, judicial participation in plea negotiations is likely to impair the trial court's impartiality. The judge who suggests or encourages a particular plea bargain may feel a personal stake in the agreement (and in the quick disposition of the case made possible by the bargain) and may therefore resent the defendant who rejects his advice. . . . Moreover, the defendant is likely to make incriminating concessions during the course of plea negotiations. . . . In the second place, judicial participation in plea discussions creates a misleading impression of the judge's role in the proceedings. As a result of his participation, the judge is no longer a judicial officer or a neutral arbiter. Rather, he becomes or seems to become an advocate for the resolution he has suggested to the defendant."[10] (Inter-

---

[10] In *State* v. *Gradzik*, supra, 193 Conn. 45, the defendant was convicted of burglary after a jury trial that had followed unsuccessful plea negotiations. The defendant claimed on appeal that the trial court improperly failed to grant the defendant's motion for recusal after it had participated in plea negotiations. Id., 44–45. This court rejected the defendant's claims, concluding that the trial court's statements that: (1) it only would accept a plea agreement without a sentencing recommendation; and (2) stated the procedure for disposing of probation violation charges against the defendant in the event of a guilty plea on the burglary charges, did not amount to participation requiring disqualification. Id., 46–47. In addressing the defendant's claims, the court also noted that "the sentence imposed was eminently fair and compassionate. Although the defendant had a lengthy criminal record, including five violations of probation, and had failed to avail himself of drug rehabilitation, the court suspended the sentence after one year with the condition that the defendant enter a drug rehabilitation program." Id., 47–48.

nal quotation marks omitted.) Citing *United States* v. *Adams*, 634 F.2d 830, 840–41 (5th Cir. 1981); *United States* v. *Werker*, 535 F.2d 198, 203 (2d Cir.), cert. denied sub nom. *Santos-Figueroa* v. *United States*, 429 U.S. 926, 97 S. Ct. 330, 50 L. Ed. 2d 296 (1976); see also *State* v. *Fullwood*, 194 Conn. 573, 581, 484 A.2d 435 (1984) (discussing risks, but concluding that record was inadequate for review of defendant's plea bargaining claims).

We reiterated our approval of the *Niblack* rule in *Safford* v. *Warden*, supra, 223 Conn. 194 and n.16. In *Safford*, we affirmed the denial of a habeas corpus petition, rejecting, inter alia, the petitioner's claim that the judge who had sentenced him was barred from doing so by the Code of Judicial Conduct because he had participated in the plea bargaining that led to the petitioner's guilty plea to sexual assault charges. Id., 188–90. We concluded that the claims were not appropriate for a habeas petition because "[a] claim that a judge should not have participated in plea negotiations, based solely upon the appearance of partiality, does not rise to the level of a constitutional violation. . . . Nor does it constitute a miscarriage of justice, or other prejudice justifying the issuance of a writ of habeas corpus." (Citation omitted.) Id., 190–91. We also rejected the petitioner's claim that his trial counsel was ineffective for failing to move for the trial court's disqualification; id., 194; and we again recited our approval of the *Niblack* rule governing plea negotiations. Id., 194 n.16. We also stated that this "procedure must be distinguished from the situation where the judge who participates in plea negotiations is also responsible for conducting the trial and, therefore, for sentencing the defendant in the event of a conviction," because, that situation gives rise to the "dangers we identified in *State* v. *Gradzik*, [supra, 193 Conn. 47] . . . ." *Safford* v. *Warden*, supra, 223 Conn. 194 n.16. We noted that adherence to the *Niblack* rule eliminates these risks because

"[a]s long as the defendant is free to reject the plea offer and go to trial before a judge who was not involved in or aware of those negotiations, he is not subject to any undue pressure to agree to the plea agreement, and the impartiality of the judge who will sentence him in the event of conviction after trial is not compromised." Id.

We most recently addressed judicial participation in plea bargaining in *State* v. *Revelo*, 256 Conn. 494, 497, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001), wherein the trial court stated that it would sentence the defendant to eight years imprisonment in accordance with a plea offer that had been made. The defendant, however, wished to move for the suppression of certain evidence. Id. The trial court told the defendant that, if the motion was unsuccessful, the sentence would be nine years imprisonment. Id., 497–98. Thereafter, the trial court held a hearing and denied the motion to suppress, and then accepted the defendant's plea of nolo contendere and sentenced him to nine years imprisonment. Id., 498–99.

On appeal, we concluded that "principles of due process prohibit a court from retaliating against a defendant merely for exercising a statutory or constitutional right. In this case, the trial court told the defendant that he would be required to serve one extra year in prison if he agreed to plead guilty only after exercising his right to a judicial determination of his motion to suppress. By requiring that additional period of incarceration for no reason other than the defendant's decision to pursue his motion to suppress, the trial court punished the defendant for doing what the law plainly allow[ed] him to do . . . . Although a court may deny leniency to an accused who, like the defendant, elects to exercise a statutory or constitutional right, a court may not penalize an accused for exercising such a right by increasing his or her sentence solely because of that election."

(Citation omitted; internal quotation marks omitted.) Id., 513. Although we noted that a trial court may advise a defendant during plea bargaining of the potential for a greater sentence after trial,[11] we concluded that "[t]he court, in wielding its power as it did in this case, discharged its sentencing function in a manner that is legally indistinguishable from the kind of 'unilateral imposition of a penalty upon a defendant who ha[s] chosen to exercise a legal right' that has been held unconstitutional." Id., 515. In particular, we noted the trial court's failure to explain why the greater sentence "might be appropriate . . . to dispel any suggestion that the court was prepared to punish the defendant merely for exercising his right to a judicial determination of his motion. Indeed, the failure of the trial court in this case to provide such an explanation is a critical factor in our conclusion that the court overstepped its constitutional bounds by adding one year to the defendant's sentence." (Citation omitted.) Id., 516.

Our analysis in *Revelo* included a comprehensive review of the restrictions on judicial participation in plea bargaining. We began "by reaffirming our recognition of the critical role that pretrial negotiations play in the criminal justice system."[12] Id., 505. Citing, inter

[11] We distinguished *Revelo* from *Bordenkircher* v. *Hayes*, 434 U.S. 357, 362, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978), "which sanctions the government's practice of threatening increased charges during the course of plea negotiations and making good on the threat if the defendant refuses to enter a plea." *State* v. *Revelo*, supra, 256 Conn. 514. We noted that this may be part of the "give-and-take" of plea bargaining between a prosecutor and a defendant, but "[s]uch is not the case when, as in this case, the court, itself, dictates the terms of a plea agreement that exacts a penalty on the defendant solely for asserting his right to challenge the constitutionality of the search and seizure that resulted in his arrest and prosecution." (Internal quotation marks omitted.) Id., 515.

[12] "'Whatever might be the situation in an ideal world, the fact is that the guilty plea and the often concomitant plea bargain are important components of [the] criminal justice system.' *Blackledge* v. *Allison*, 431 U.S. 63, 71, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977). Indeed, the United States Supreme Court has stated that '[t]he disposition of criminal charges by agreement between the prosecutor and the accused . . . is an essential component

alia, then rule 11 (e) of the Federal Rules of Criminal Procedure; id., 506 n.22; we also noted that, "[a]lthough plea bargaining between the state and the accused is a universally accepted practice, many jurisdictions bar judges from active participation in plea negotiations." Id., 506. Citing our decision in *Safford* v. *Warden*, supra, 223 Conn. 194 n.16, we contrasted the inherent "dangers" of a judge presiding over a defendant's trial after active participation in unsuccessful plea negotiations; *State* v. *Revelo*, supra, 256 Conn. 506 n.23; with "judicial involvement in plea discussions when it is clear to all concerned parties that, in the event a plea agreement is not reached, the judge involved in the plea negotiations will play no role in the ensuing trial, including the imposition of sentence upon conviction." Id., 506–507, citing *State* v. *Niblack*, supra, 220 Conn. 280.

*Niblack* established a clear and bright line rule standing for the proposition that it is improper for a trial judge to preside over a defendant's trial after having participated actively in unsuccessful plea negotiations in the case. Moreover, although it is well established that the *Niblack* rule is itself not of constitutional dimensions; *Safford* v. *Warden*, supra, 223 Conn. 190–91; scrupulous adherence thereto nevertheless aids in the

---

of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the [s]tates and the [f]ederal [g]overnment would need to multiply by many times the number of judges and court facilities.

" 'Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned.' *Santobello* v. *New York*, 404 U.S. 257, 260–61, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971)." *State* v. *Revelo*, supra, 256 Conn. 505–506.

enforcement of the constitutional requirement of an impartial judiciary and the constitutional prohibition against increasing defendants' sentences in retaliation for their having exercised their sixth amendment right to a trial. See *German* v. *United States,* 525 A.2d 596, 601–602 (D.C.) (prohibition of judicial participation in plea bargaining is "prophylactic" and "rule of practice for trial courts; it does not embody a constitutional limitation"), cert. denied, 484 U.S. 944, 108 S. Ct. 331, 98 L. Ed. 2d 358 (1987). Accordingly, violation of the *Niblack* rule is, *by itself,* not a "truly extraordinary [situation] where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Alston,* supra, 272 Conn. 456.

We conclude that establishing a violation of the *Niblack* rule does not, therefore, excuse the defendant from "demonstrat[ing] that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) Id. Rather, the defendant must demonstrate on appeal that the record in the case actually implicates the dangers of judicial participation in plea negotiations, the primary examples of which were discussed in *Safford* v. *Warden,* supra, 223 Conn. 194 n.16.[13] Accordingly, before reversing a judgment of conviction and a concomitant sentence, we must look beyond the fact of the *Niblack* violation and review the record as a whole for evidence of actual or apparent prejudice to the defendant. See *German* v. *United States,* supra, 525 A.2d 602 (noting "core concern" of resentment of

---

[13] These dangers include: "(1) the trial judge's impartiality may truly be compromised by his own perception of 'a personal stake in the agreement,' resulting in resentment of the defendant who rejects his suggested disposition, (2) the defendant may 'make incriminating concessions during the course of plea negotiations,' and (3) the trial judge may become or appear to become an advocate for his suggested resolution." *Safford* v. *Warden,* supra, 223 Conn. 194 n.16.

defendant by court after unsuccessful negotiations and stating that "[t]he selection of a proper remedy . . . merges into the question whether the defendant has been penalized for exercising his sixth amendment right to a jury trial"); see also id., 603 ("the same standards and case law can be employed to determine both the [harmless error] inquiry and the constitutional question whether [the defendant] has been improperly penalized for exercising his sixth amendment right to a trial by jury"). In doing so, we consider, in addition to judicial participation in unsuccessful plea negotiations followed by a harsher sentence than initially was offered, factors that include: "(1) whether the trial judge initiated the plea discussions with the defendant . . . (2) whether the trial judge, through his or her comments on the record, appears to have departed from his or her role as an impartial arbiter by either urging the defendant to accept a plea, or by implying or stating that the sentence imposed would hinge on future procedural choices, such as exercising the right to trial; (3) the disparity between the plea offer and the ultimate sentence imposed; and (4) the lack of any facts on the record that explain the reason for the increased sentence other than that the defendant exercised his or her right to a trial or hearing." *Wilson* v. *State*, 845 So. 2d 142, 156 (Fla. 2003); accord *State* v. *Gradzik*, supra, 193 Conn. 47–48 (concluding that "the sentence imposed was eminently fair and compassionate" in light of defendant's "lengthy criminal record, including five violations of probation" and failure "to avail himself of drug rehabilitation"); cf. *State* v. *Messier*, 16 Conn. App. 455, 459–60, 549 A.2d 270 (presiding trial judge did not improperly deny defendant's recusal motion when pretrial participation was brief and record provided "no basis for concluding that the trial judge's pretrial activities so impaired, or appeared to impair, his ability to act as a judicial officer or a neutral arbiter that it was

error to deny the motion for disqualification" [internal quotation marks omitted]), cert. denied, 209 Conn. 829, 552 A.2d 1216 (1988).

Indeed, our rejection of a per se reversal rule for *Niblack* violations is consistent with the approach to this issue taken by the federal courts and the majority of our sister states.[14] We, therefore, begin with a review of the federal approach. Unlike Connecticut trial judges, federal district judges are not permitted to participate in the plea negotiation process at all. See Fed. R. Crim. P. 11 (c).[15] This prohibition exists primarily to avoid

[14] The defendant contends that the harmless error approach taken by the federal court is inapposite because the federal rule is an absolute bar on judicial involvement in plea bargaining. The defendant argues similarly with respect to states that have adopted procedural rules governing judicial participation in plea negotiations that are different from Connecticut's. These are, however, distinctions without a difference, because the risks attendant to judicial participation in plea negotiation are the same, regardless of the degree to which such participation is prohibited or permitted in a jurisdiction. Trial court adherence to the prophylactic rules governing participation in plea bargaining has the salutary effect of eliminating or minimizing those risks, as well as removing another arrow from the defendant's appellate quiver. Adherence or departure does not, however, alter the key inquiry, namely, whether the record discloses the realization of those risks.

[15] Rule 11 of the Federal Rules of Criminal Procedure governs pleas, and provides in relevant part: "(a) Entering a Plea.

"(1) In General. A defendant may plead not guilty, guilty, or (with the court's consent) nolo contendere. . . .

"(c) Plea Agreement Procedure.

"(1) In General. An attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement. *The court must not participate in these discussions.* If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:

"(A) not bring, or will move to dismiss, other charges;

"(B) recommend, or agree not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request does not bind the court); or

"(C) agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing

the appearance of coercion because "[a] defendant may be motivated to enter an involuntary guilty plea if he fears that his rejection of the plea will mean imposition of a more severe sentence after trial or decrease his chances of obtaining a fair trial before a judge who he has challenged." (Internal quotation marks omitted.) *United States* v. *Diaz*, 138 F.3d 1359, 1363 (11th Cir.), cert. denied, 525 U.S. 913, 119 S. Ct. 259, 142 L. Ed. 2d 213 (1998). The federal courts, however, also have determined that an absolute ban on judicial participation "serve[s] important prophylactic purposes" by ensuring the appearance of judicial impartiality during

Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

"(2) Disclosing a Plea Agreement. The parties must disclose the plea agreement in open court when the plea is offered, unless the court for good cause allows the parties to disclose the plea agreement in camera.

"(3) Judicial Consideration of a Plea Agreement.

"(A) To the extent the plea agreement is of the type specified in Rule 11 (c) (1) (A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report.

"(B) To the extent the plea agreement is of the type specified in Rule 11 (c) (1) (B), the court must advise the defendant that the defendant has no right to withdraw the plea if the court does not follow the recommendation or request.

"(4) Accepting a Plea Agreement. If the court accepts the plea agreement, it must inform the defendant that to the extent the plea agreement is of the type specified in Rule 11 (c) (1) (A) or (C), the agreed disposition will be included in the judgment.

"(5) Rejecting a Plea Agreement. If the court rejects a plea agreement containing provisions of the type specified in Rule 11 (c) (1) (A) or (C), the court must do the following on the record and in open court (or, for good cause, in camera):

"(A) inform the parties that the court rejects the plea agreement;

"(B) advise the defendant personally that the court is not required to follow the plea agreement and give the defendant an opportunity to withdraw the plea; and

"(C) advise the defendant personally that if the plea is not withdrawn, the court may dispose of the case less favorably toward the defendant than the plea agreement contemplated. . . .

"(h) Harmless Error. *A variance from the requirements of this rule is harmless error if it does not affect substantial rights.*" (Emphasis added.)

trial and sentencing. (Internal quotation marks omitted.) *United States* v. *Crowell*, 60 F.3d 199, 205 n.11 (5th Cir. 1995). Despite the categorical ban, such participation nevertheless is subject to review for harmless error. Fed. R. Crim. P. 11 (h).

In conducting this harmless error review, in the absence of other claimed trial errors, the federal courts of appeal "examine whether the district court's participation might reasonably be said to have affected the court's impartiality in the conduct of the trial or sentencing." *United States* v. *Crowell*, supra, 60 F.3d 205; see also *United States* v. *Diaz*, supra, 138 F.3d 1364 ("most importantly, the district court based [the defendant's] sentence on entirely sound reasons and displayed no bias in sentencing him"). For example, in *United States* v. *Crowell*, supra, 205, the United States Court of Appeals for the Fifth Circuit concluded that the trial court's participation in plea bargaining caused no harm with respect to the defendant's trial because the defendant did not raise any claims on appeal with respect to sufficiency of the evidence, evidentiary rulings, jury instructions or other trial procedure. The court did, however, conclude that there was harm with respect to the defendant's sentence because: (1) the government did not argue harmless error; and (2) comments made by the trial court during the plea negotiations indicated a "premature commitment to a sentence of at least a certain level of severity." Id., 205. Accordingly, it affirmed the defendant's convictions, but vacated the sentences and remanded for resentencing by a different judge. Id., 206–207.

We also find helpful the approaches taken by other state courts, such as the Florida Supreme Court's recent decision in *Wilson* v. *State*, supra, 845 So. 2d 152, wherein the court recognized that "imposition of a harsher sentence, without explanation on the record after judicial participation in the plea negotiations, does

raise concerns" of judicial vindictiveness that are constitutional in scope.[16] The court cited cases that "illustrate the tension between the realistic expectation . . . that a guilty plea may justify leniency . . . and the constitutional imperative that a defendant should not be penalized by the judicial system for not accepting a plea and exercising his or her constitutional right to proceed to trial." (Citation omitted; internal quotation marks omitted.) Id., 156. The court adopted a totality of the circumstances analysis "to employ to determine whether a defendant's constitutional right to due process of law was violated by the imposition of an increased sentence after unsuccessful plea discussions in which the trial judge participated." Id. The Florida court enumerated factors to consider, which, in addition to judicial participation in plea negotiations followed by a harsher sentence, include: "(1) whether the trial judge initiated the plea discussions with the defendant . . . (2) whether the trial judge, through his or her comments on the record, appears to have departed from his or her role as an impartial arbiter by either urging the defendant to accept a plea, or by implying or stating that the sentence imposed would hinge on future procedural choices, such as exercising the right to trial; (3) the disparity between the plea offer and the ultimate sentence imposed; and (4) the lack of

---

[16] Florida's highest court permits trial judges to participate in plea negotiations subject to prophylactic limitations "necessary to minimize the potential coercive effect on the defendant, to retain the function of the judge as a neutral arbiter, and to preserve the public perception of the judge as an impartial dispenser of justice." (Internal quotation marks omitted.) *Wilson v. State*, supra, 845 So. 2d 151. The restrictions require that the proceedings be on the record and that the trial court may not: (1) initiate the plea discussions; (2) "state nor imply alternative sentencing possibilities which hinge upon future procedural choices, such as the exercise of a defendant's right to trial"; and (3) fail to permit the defendant to withdraw his guilty plea "if the judge later determines that a greater sentence must be imposed." (Internal quotation marks omitted.) Id. Florida does not, however, require automatic recusal in the event that negotiations are unsuccessful; the same judge may later preside. Id.

any facts on the record that explain the reason for the increased sentence other than that the defendant exercised his or her right to a trial or hearing."[17] Id., 156.

The vast majority of our sister states have, despite their varying degrees of acceptance of judicial participation in plea bargaining, adopted approaches similar to that taken by both Florida and the federal courts for assessing any harm that may have befallen a defendant as a result of that practice. See *Pelmer* v. *State*, 389 So. 2d 584, 589–91 (Ala. Crim. App. 1980) (trial court aware of defendant's rejection of state's two year offer, and sentenced defendant to five years after trial, but no indication of vindictiveness because sentence proper in light of statutory limit and defendant's prior felony convictions); *People* v. *Clark*, 183 Colo. 201, 203, 515 P.2d 1242 (1973) (stating that judicial participation "in plea bargaining is fundamentally unfair and brings to bear the full force and majesty of a court on a defendant," and concluding that resentencing was required because of trial court's assurance during unsuccessful negotiations that defendant would be " 'put away forever' " if he was convicted after trial); *German* v. *United States*, supra, 525 A.2d 603 (success of claim for retaliation requires that the defendant "affirmatively demonstrate 'a reasonable likelihood of vindictiveness' on the part of the trial judge"); *People* v. *Dennis*, 28 Ill. App.

---

[17] In *Wilson* v. *State*, supra, 845 So. 2d 157–58, the court applied its totality of the circumstances test to the two consolidated cases before it, and concluded that resentencing was required where the trial court "urg[ed] [the defendant] to accept the plea offer of thirty years and stat[ed] that if [the defendant] chose to go to trial he 'certainly' would not get that low," as well as the forty year disparity between the offer and the sentence imposed. In the other case, the trial court had offered the defendant a 128 month sentence in exchange for a guilty plea, which was withdrawn when the defendant asked for a hearing. Id., 158. After the hearing, the court sentenced the defendant to 150 months without explanation, and the record provided none. Id. The court concluded that these circumstances in both cases had raised a presumption of judicial vindictiveness that the state had failed to rebut because of the lack of explanation for the sentences. Id.

3d 74, 78, 328 N.E.2d 135 (1975) (noting that "a mere disparity between the sentence offered during plea bargaining and that ultimately imposed, of itself, does not warrant the use of our power to reduce a term of imprisonment," but finding disparity requiring relief when defendant had been offered two to six years, but was sentenced after trial to forty to eighty years); *Garrett v. State*, 737 N.E.2d 388, 389–91 (Ind. 2000) (concluding that trial court's statement to defendant during plea bargaining that he would get maximum sentence if convicted was improper and raised potential for judicial vindictiveness, but that defendant could not prevail because he failed to object to comments and sentence was supported by defendant's criminal history and lack of mitigating evidence); *State v. Molinario*, 530 So. 2d 665, 668 (La. App. 1988) (trial judge's offer of four years imprisonment during plea negotiations, followed by ten year sentence after trial "underscores the problems inherent in a judge's participation in plea bargain negotiations," but reversal not warranted because judge learned more about defendant's record after trial and articulated explanation of sentence), cert. denied, 536 So. 2d 1212 (La. 1989); *Commonwealth v. Ford*, 35 Mass. App. 752, 757–58, 626 N.E.2d 1 (1994) (stating that judge's presiding over trial after violating prohibition of active participation in plea negotiations "does not mean that a judgment after trial must be vacated for presumptive bias on the part of the judge" where record and sentence indicate that defendant was "not unfairly tried or vindictively sentenced"); *State v. Wilson*, 750 S.W.2d 560, 565 (Mo. App. 1988) (rejecting defendant's claim in aggravated robbery case that trial court should have recused itself after stating that it " 'guarantee[d]' " defendant never would get out of jail if convicted after trial because "record demonstrates the impartiality and evenhandedness of the court in dealing with the defendant despite his obstreperous conduct"); *State v. Hall*,

317 Mont. 356, 365–66, 77 P.3d 239 (2003) (discussing vindictiveness concerns and remanding for resentencing when trial court was involved in plea bargaining and failed to explain on record "why the sentence was more onerous than the sentence offered before trial"); *State* v. *Moore*, 4 Neb. App. 564, 578, 582–84, 547 N.W.2d 159 (1996) (noting that judicial participation in plea bargaining process is "strongly discourage[d]" and record must establish that reason for harsher sentence imposed after trial "is due solely to the facts of the case and the personal history of the defendant"); *State* v. *Mitchell*, 117 Ohio App. 3d 703, 706–708, 691 N.E.2d 354 (1997) (concluding, notwithstanding remark at sentencing that defendant should have taken plea offer, that defendant's sentence was not product of vindictiveness when trial court: [1] imposed less than maximum sentence; [2] stated that he was not imposing maximum sentence "merely because defendant insisted upon his right to a trial"; [3] discussed defendant's extensive prior criminal history; and [4] noted defendant's failure to take responsibility for his actions as evinced by defendant's remarks to judge at sentencing); *State* v. *Kimsey*, 182 Or. App. 193, 206 n.7, 47 P.3d 916 (2002) (noting in dicta that judge presiding over trial may not participate in plea negotiations, but that "a trial judge's active participation in plea negotiations has been held not to be a per se violation of any constitutional fair trial guarantee and a basis on which a defendant may automatically invalidate a plea or obtain a reversal of a conviction"); *Commonwealth* v. *Palmer*, 463 Pa. 26, 34–35, 342 A.2d 387 (1975) (Judge's improper participation in plea bargaining before trial did not require reversal when defendant did not claim that "the trial judge was prejudiced against him; that anything occurred prejudicing him before the jury; or that the province of the jury was invaded in any way. These factors, plus a careful review of the record, convince us that [the

defendant's] trial comported with due process standards and, as a result, a just sentence was imposed."); *State v. Davis*, 155 Vt. 417, 420–21, 584 A.2d 1146 (1990) (noting that Vermont judges may participate in plea bargaining and that "the mere disparity between plea-bargained and post-trial sentences does not mandate a presumption of vindictiveness" in absence of record evidence such as improper comments); *State v. Sanders*, 209 W. Va. 367, 383, 549 S.E.2d 40 (2001) (stating that defendant should, if found competent on remand, be "resentence[d] . . . to no more than the previously offered thirty years, as we find nothing in the record affirmatively showing that the escalation in sentence was not the result of [the defendant's] refusal to plead guilty");[18] but see *State v. Miller*, Docket No. 1 CA-CR 98-0153, 1999 Ariz. App. LEXIS 93, at *18 (February 9, 1999) (depublished opinion) (presuming prejudice and finding "fundamental error" requiring reversal when "[t]he judge improperly participated in the plea discussions and was clearly of the opinion that the [d]efendant should accept the [s]tate's offer").

Accordingly, we conclude that a trial court presiding over a trial after having first participated in unsuccessful plea bargaining efforts is not, by itself, plain error

---

[18] See also *Fermo v. State*, 370 So. 2d 930, 932–33 (Miss. 1979) (stating prohibition on judicial participation in plea negotiations, but concluding that reversal was not warranted because that participation had been induced by defendant's attorney); *Ryder v. State*, 83 P.3d 856, 863 (Okla. Crim. App.) (not improper when trial court "merely advised . . . that the [state's] offer was a good one and that he should consider the advice of counsel and accept the offer" and finding no prejudice when defendant rejected offer and proceeded to trial), cert. denied, U.S. , 125 S. Ct. 215, 160 L. Ed. 2d 146 (2004); *Wright v. State*, 776 S.W.2d 763, 767 (Tex. App. 1989) (concluding that it was improper for trial court sua sponte to initiate plea discussions, but that error was harmless because coercion concerns were not present because defendant declined offer, and jury was not aware of plea conference; no sentencing claim).

requiring reversal.[19] Violation of this prophylactic rule does not require reversal when the record demonstrates that the defendant otherwise has received a fair trial

[19] Moreover, we note that this approach is consistent with our decision in *State* v. *Fitzgerald*, supra, 257 Conn. 106. In *Fitzgerald*, the defendant was charged with driving while intoxicated in a two part information because, with two prior convictions for the same offense, "he was subject to the enhanced penalty provisions of [General Statutes] § 14-227a (h) (3)." Id., 108. "The defendant was charged in a two part information according to the provisions of Practice Book § 36-14, formerly § 619. Part A of the information charged the defendant with operating a motor vehicle while under the influence of intoxicating liquor. Part B of the information charged the defendant with two previous convictions of the same offense." Id., 108–109. Prior to the commencement of a bench trial, the prosecutor improperly revealed to the trial court the existence of the part B information in violation of Practice Book § 37-11. Id., 109–110. Thereafter, the defendant was convicted and the trial court denied the defendant's motion for a new trial. Id., 109. The Appellate Court had concluded that "the prosecutor's statement regarding the part B information tainted the case and constituted plain error requiring a new trial. *State* v. *Fitzgerald*, 54 Conn. App. 258, 266, 737 A.2d 922 (1999).

This court granted the state's petition for certification and reversed the judgment of the Appellate Court. *State* v. *Fitzgerald*, supra, 257 Conn. 110–11. We concluded that "[t]he improper disclosure by the prosecutor in this case did not amount to a mistake so manifest as to constitute plain error. Our review of the record reveals that any harm caused by the improper disclosure did not in any way undermine the validity of the guilty verdict. The trial court found that the evidence presented in the case sufficiently satisfied the state's burden of proving guilt beyond a reasonable doubt. Our careful review of the evidence supports this conclusion. Also we cannot conclude, as a finding of plain error requires, that the prosecutor's comment implicates the public confidence in our judiciary. Finally, we find nothing in the record that leads us to conclude that the trial court's verdict was unreliable or that it constituted a manifest injustice to the defendant." Id., 112.

In so concluding, we stated that "[t]he Appellate Court should have reviewed the record to determine whether the trial court abused its discretion in denying the defendant's motion for a new trial"; id., 112; and we concluded that the trial court did not abuse its discretion in that respect. Id., 112–13. We noted that on the facts of the particular case, posttrial comments demonstrated that the trial judge had forgotten about the prosecutor's comments, and that we could not conclude that, "in the total absence of illicit motivation or biased judicial behavior, the prosecutor's comment here amounts to an error requiring a new trial." Id., 113. We held that, "[o]n the facts of this case, the prosecutor's comment before the court appears to be more of a technical violation of the rules of practice rather than a substantive deprivation of the defendant's right to an impartial fact finder." Id., 114–15.

and sentencing before an impartial court, and that the core danger of judicial vindictiveness has not been realized.[20] Accordingly, we now turn to the records of the probation violation hearing and the criminal trial in the present case, to assess whether the trial court appears to have departed from its role of impartiality in light of its involvement in the plea discussions, the hearing

---

[20] We discuss briefly the defendant's reliance on the Appellate Court's decisions in *State* v. *Falcon*, supra, 68 Conn. App. 884, and *State* v. *Washington*, supra, 39 Conn. App. 175. We begin with *Washington*, a probation violation case, which we conclude is distinguishable on its facts because, in that case, the trial court had: (1) made its own offer to the defendant; *State* v. *Washington*, supra, 177; and (2) made comments during plea bargaining "indicating the judge's prehearing belief that the defendant was probably engaged in illegal activities [that] along with the implicit notion of guilt associated with the offers, cast serious doubt on the court's impartiality." Id., 180; id., 179–80 (referring to " 'probably illegal' " reasons for defendant's possession of a beeper). Moreover, in *Washington*, the trial court made intemperate remarks to the defendant prior to sentencing him after finding him in violation of probation. Id., 181 (in addition to longer sentence than was offered, trial court reneged on plea bargain offer to allow defendant to get his affairs in order before starting sentence, and stated that " '[r]emember you had a chance to just get rid of everything and you did not, which was very foolish' "). Accordingly, we conclude that *Washington* is distinguishable from the present case on its facts, and was, as a paradigmatic example of the appearance of judicial vindictiveness that is contemplated by the *Niblack* rule, a proper candidate for plain error reversal.

The Appellate Court decision in *State* v. *Falcon*, supra, 68 Conn. App. 884, is vastly closer to the present case than is *Washington*. In *Falcon*, the Appellate Court followed *Washington* and concluded that it was plain error for the trial court to preside over the defendant's trial after having participated in plea bargaining negotiations held more than two years earlier, a fact which none of the participants appeared to remember at the time of trial. Id., 889. The Appellate Court concluded that "actual prejudice is not required," and that "the existence of impartiality might reasonably be questioned and the fairness and integrity of and public confidence in the judicial proceeding affected when a court presides over the trial and sentencing after participating actively in plea negotiations." Id., 889. Beyond a posttrial sentence greater than was offered during plea bargaining, the Appellate Court did not cite any examples of apparently biased conduct by the trial court. Accordingly, to the extent that the Appellate Court decision in *State* v. *Falcon*, supra, 884, conflicts with principles set forth in our opinion herein, it is overruled.

and the trial,[21] and the appropriateness and fairness of the sentence in this particular case.[22]

## C

## Probation Violation Hearing

We begin with the record of the probation violation hearing, which was held before Judge Clifford on April 3 and 17, 2002. The hearing began with the trial court and the defendant remembering each other from the prior proceedings, followed by a canvass of the pro se defendant to ensure that he was aware of his rights and

[21] The dissent expresses concern about the dangers of judicial participation in plea bargaining, and states that "we as a reviewing court can neither indulge a presumption of regularity nor necessarily evaluate the resulting harm" because, "[i]n order to evaluate with any degree of confidence whether the concerns associated with active participation in plea bargaining by the judge responsible for the trial have indeed materialized, the proceedings in their entirety would have to be open for inspection." The dissent then notes that, "only one side of the equation is open for inspection" because pretrial proceedings generally are not part of the record. We agree with the dissent's concerns with respect to the inherent impossibility of properly reviewing unrecorded proceedings, but we conclude that they simply are *not* a factor in the present case because the trials and the plea bargaining session at issue are entirely on the record, which is adequate for appropriate appellate review.

[22] We discuss briefly the defendant's claim, as an alternate ground for affirming the judgment of the Appellate Court, that the trial court's failure to follow the *Niblack* rule is a due process violation reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. We reaffirm our prior conclusions that the *Niblack* rule is not, by itself, constitutional in nature. See, e.g., *Safford* v. *Warden*, supra, 223 Conn. 190–91. We acknowledge that the risks managed by the *Niblack* rule relate to the constitutional requirement that a defendant receive a trial before a court who, at the very least, appears free of bias. See, e.g., *Tumey* v. *Ohio*, 273 U.S. 510, 532, 47 S. Ct. 437, 71 L. Ed. 2d 749 (1927) ("[e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the [s]tate and the accused, denies the latter due process of law"); *Cameron* v. *Cameron*, supra, 187 Conn. 170–71 ("[t]he appearance as well as the actuality of impartiality on the part of the trier is an essential ingredient of a fair trial"). This interest, however, does not require per se reversal, but rather is protected by appellate review of the record for actual indications that the appearance of impartiality has been shattered.

the procedure for probation violation hearings, as well as his potential exposure for incarceration. At the beginning of the hearing, without prompting from the defendant, the trial court immediately ordered the defendant's handcuffs removed in accordance with a promise made at the March plea bargaining session. Kathleen Carabetta, the defendant's supervising probation officer, then testified that she had supervised him pursuant to a sentence for two driving while intoxicated convictions in 2000; it was a concurrent sentence of thirty months, with execution suspended after twenty-four months, with one year probation. The court's orders of probation were admitted into evidence, as well as the conditions of probation signed by the defendant in October, 2001. Those conditions were that the defendant was to: (1) refrain from operating a car while his license was under suspension; (2) obtain substance abuse screening, evaluation and treatment in accordance with the probation officer's recommendations; (3) perform 200 total hours of community service; and (4) refrain from assaulting, threatening or harassing his mother. In November, 2001, Carabetta received a postscreening recommendation that the defendant be placed inpatient at a residential treatment program because he had reported that he still was drinking; the clinician who did the screening also had reported to Carabetta that the defendant became hostile and started yelling that he was not going into a residential program.

Shortly thereafter, Carabetta met with the defendant to discuss the recommended treatment plan. At this meeting, the defendant became hostile; Carabetta told the defendant that, if he refused to go into the program, she would obtain a warrant for violation of probation. She testified that he told her to "[g]o ahead and get your warrant and I'll see you in court at a hearing," and that he "could do six months in jail no problem." She then directed the defendant to leave, and obtained the

warrant. After being reminded by the court of his right to cross-examine Carabetta, the defendant declined the opportunity to do so.

After the trial court again reminded him of his right to remain silent, the defendant then testified on his own behalf. Shortly after the defendant was sworn, the trial court observed that he was "[n]ervous" and seemed like he was "going to get emotional," and therefore, sua sponte offered him a break so that he could compose himself. After the break, the defendant explained, in narrative form, his version of what had occurred. He explained that he disagreed with the inpatient treatment and anger management classes directed by probation, and discussed his efforts to obtain employment and find a place to live. The defendant apparently became emotional again as the trial court offered him a glass of water during this narrative. After the defendant concluded his narrative, the state cross-examined him briefly. The defendant conceded on cross-examination that he had refused to comply with the directions of the probation officer. He offered no other witnesses or evidence on his own behalf.

The trial court then heard brief closing arguments from the state and the defendant, and concluded that the state had proven by a fair preponderance of the evidence that the defendant had violated the terms of his probation.[23] See *State* v. *Faraday*, 268 Conn. 174,

---

[23] After hearing arguments from the state and the defendant, the trial court informed the defendant that it was "commendable" that he was "concerned about how [he was] going to do [his] 200 hours of community service. But as far as deciding whether you violated the condition of probation, I know that the condition I put on you was substance abuse screening, evaluation and treatment as recommended by probation. That is clear from the exhibits that have been submitted. I don't disagree that there's nothing—I didn't specifically put a condition of any anger management counseling, although I think probation has that inherent authority, especially when one of the conditions was [that] you do not assault, threaten or harass your mother.

"But I'm not concerned about that. I'm more concerned about the fact that you just refused to do the inpatient treatment. I think it's a—you were convicted as a third [driving while intoxicated] offense. You received a very

183–84, 842 A.2d 567 (2004). The trial court then offered the defendant the opportunity to be heard with respect to the appropriate sentence, asking the defendant "should [I] just put you back on the probation or what . . . should [I] do with you?" The defendant then stated that "I never agreed to probation in the beginning," and after some discussion of the original plea canvass, that "I don't know. I definitely do not want probation reinstated. It's just too difficult to get around and make appointments with people, try to keep your job, keep above water. I have no driver's license. At this point, sir, the bus situation, the transportation situation, is less than excellent in this particular part of the state from East Hampton to Middletown. The counseling services, I was not happy about that. I've been to other counseling services and I feel that I should have—the counseling services should have been a little bit more lenient to my condition, my particular case. . . . I was trying to get back on my feet as a normal citizen of the state and they made it impossible for me, sir."

The trial court then acknowledged its sympathy with the defendant's "frustration," and the difficulties inherent in complying with the probation conditions while

serious sentence obviously, [thirty] months suspended after [twenty-four] months. And I think that was a reasonable condition of the probation by me for any substance abuse evaluation and treatment as necessary, and to me that does include inpatient if that's what is deemed appropriate. And it sounds like based on their meeting with you, based on the counselor's interview with you, the apparent admission that you had been drinking, with that history they certainly felt with that situation, the type of case it was, that you should be doing inpatient. So, I think that was a reasonable request.

"I feel if you differed with that, then maybe you could have filed a modification or come back before this court to attempt to modify your probation, but that's not exactly what happened.

"So I do find based on the reliable and probative evidence that was supplied here, based on a fair preponderance of the evidence that you did violate that condition by not complying with the inpatient treatment that was inherent in my general order of probation of substance abuse evaluation, treatment and testing as deemed appropriate. So I do believe and I am finding that you did violate that probation."

"you're trying to get back on the road. But the problem is it's not your call. See, that is what the problem is. It's probation's. Maybe you're right. Maybe originally you shouldn't have received probation. You're obviously not a probation kind of a guy because, you know, you didn't want to do this inpatient. So, I understand that." The trial court then considered the defendant's prior criminal record,[24] and stated: "I agree with the defendant, I think I can penalize him more if he sat in jail now for three and a half months—I think the greater penalty would be if I sentenced you and kept you on the probation or extended the probation. I have the authority to extend the probation another two years. I think that would be a worse punishment to you if I said, well, I'm not going to put you in jail for this. I'm just going to extend the probation a couple of more years. I know you don't want probation. It's not going to work out with you in probation." Accordingly, the trial court stated that "the beneficial aspects of probation [are] no longer being served," and sentenced the defendant to complete the six months suspended portion of his sentence, with credit received for the three and one-half months pretrial detention. See *State* v. *Faraday*, supra, 268 Conn. 185 ("[i]f a violation is found, a court must next determine whether probation should be revoked because the beneficial aspects of probation are no longer being served" [internal quotation marks omitted]). The trial court, the state and the defendant then discussed the defendant's upcoming criminal trial, and the appointment of standby counsel to assist the defendant in those proceedings because of his continued desire to proceed pro se therein.

We conclude that the trial court presided over the probation violation proceedings in a fair and even-

[24] The trial court recited the defendant's convictions since 1991 of interfering with an officer, failure to appear, trespass, breach of the peace, disorderly conduct, driving while intoxicated, and operating a vehicle with a suspended license.

handed manner, and the record reveals no manifest injustice therein. We begin by noting that the facts underlying the probation violation were not discussed during plea negotiations; see footnote 4 of this opinion; accordingly, they could not improperly have colored the trial court's factual findings. Moreover, the trial court's finding that the defendant violated the terms of his probation was supported by a preponderance of the evidence on the record, and the defendant does not attack the validity of that finding on appeal. No reference was made at any point to the defendant's failure to accept the state's plea offer. The trial court was solicitous of the defendant throughout the hearing, offering him a break when necessary for him to regain his composure. Most importantly, the sentence was appropriate, and grounded both in the defendant's past criminal record and his admitted difficulties in complying with the terms of probation; indeed, the defendant explicitly stated that he did not wish to be placed back on probation. Accordingly, we conclude that the concerns of judicial vindictiveness contemplated by the *Niblack* rule were not realized in the probation violation proceedings, and, therefore, the Appellate Court improperly reversed the judgment of the trial court.

D

Criminal Jury Trial on Interfering With an
Officer and Trespass Charges

We next consider the record from the defendant's criminal jury trial on the trespass and interfering with an officer charges. When the trial began, the court ordered the removal of the defendant's handcuffs, but denied his motion for a bond reduction, finding no change in circumstances. The trial court then heard oral argument on the defendant's motion to dismiss the interfering with an officer charges, which was based on the police officers' alleged attack on him and failure

to show their warrants, but the court denied that motion, explaining that it implicated actual defenses that presented issues of fact for the jury.[25] Pursuant to the state's joinder motion, the cases were then set for a consolidated trial on the various charges. Prior to the conclusion of the hearing on the joinder motion, the court, noting the importance of the defendant's appearance at trial, inquired about the availability of clothing other than the prison garb for the defendant, who was aided by standby counsel.[26] The trial court then recanvassed the defendant to ensure that he understood the role of standby counsel in the pro se proceedings, as well as his rights of cross-examination and the fifth amendment implications of testifying on his own

[25] The court explained to the defendant: "I don't know if some of these things require testimony. They don't sound like they're proper for a motion to dismiss. You know, you're charged with interfering or resisting arrest. Somebody could still interfere and resist arrest and yet the police may do something after that that is wrong, but it doesn't mean you didn't interfere. It's really not appropriately handled by an oral motion to dismiss; so I really don't see a basis for the motions to dismiss and I'm going to deny them at this time. Now, maybe some of the things you're indicating are actual defenses to what you're charged with and these things may come up at trial and a jury certainly may end up finding you not guilty, but I don't think they're properly subject to a motion to dismiss in the way that it's been presented to this court."

[26] "The Court: Do you have any, are you going to wear any other clothes in front of the jury? You don't want to be in front of the jury with those.

"[The Defendant]: Well, the thing is all my clothes are in the house that I was charged for criminal trespass.

"The Court: Will you be able to get him some substitute clothing as standby counsel?

"[Standby Counsel]: I think I could do that.

"The Court: Don't you have access to clothes or no, I don't know.

"[Standby Counsel]: We can do something. We'll try and do something.

"The Court: All right. If nobody else can get you clothes, they will try to get something else because you don't want to appear in front of a jury like that.

"[The Defendant]: No, I would assume not.

"The Court: Because you don't want the jury to know that you are incarcerated. What else, do you have any other questions . . . ?

"[The Defendant]: No. No, sir."

behalf.[27] At the suggestion of the state's attorney, who noted his concern that the trial court had signed the arrest warrants in the case, the trial court then obtained the defendant's consent to preside at the trial.[28]

Thereafter, a jury was empaneled and the trial commenced on June 13, 2002. The trial court ordered the removal of the defendant's handcuffs and leg irons before the jury entered the courtroom for the court's preliminary remarks.[29] Thereafter, the trial commenced, and the jury reasonably could have found the following facts from the exhibits and testimony adduced therein. The defendant had a falling-out with his mother, Frances D'Antonio, who owned a home located at 137 Wopowog Road in East Hampton; she told him several times that he no longer was welcome at that house. In September, 1999, she obtained a restraining order from the

---

[27] We also note that, when the trial court recanvassed the defendant to ensure his competency to proceed pro se, the trial court explained to the defendant trial procedures and jury selection. Moreover, after explaining the importance of the rules of evidence, the trial court granted the defendant's request to spend some time with standby counsel to learn the rules.

[28] "[The Prosecutor]: One other issue. Your Honor was the one who signed the arrest warrant that doesn't seem to present any problem to—from what I can see because—

"The Court: Well, I don't think so, unless he was challenging the arrest warrant. I think it is a problem if I signed the search warrant, he is attacking the search—I don't recall even signing the warrants, but I don't see it as any problem. Do you see it as a problem?

"[The Defendant]: The warrants, the warrant that you signed?

"The Court: He says I am the one who signed the arrest warrants for your—

"[The Defendant]: Well, I had asked, I had asked the police to show [me] the warrant. They asked me to surrender and I said—

"[Standby Counsel]: Could I just have a moment with him?

"The Court: All right. I don't know if that is quicker, but . . . . *Do you have a problem with me sitting on even—*

"[The Defendant]: *No objection.*

"The Court: Okay. All right. Well, I will ask him some more questions tomorrow." (Emphasis added.)

[29] The trial court then denied the defendant's motion to present the jury with pamphlets reprinting the constitution and the bill of rights, but explained to the defendant the procedure by which exhibits could be admitted and presented to the jury.

court, which was continued permanently until further order by the court, *Higgins*, *J.*, in April, 2000.[30] On the evening of December 9, 2001, she returned from Florida to find the defendant in her home. He did not speak to his mother, but said to her daughter-in-law that "I live here." The defendant's mother contacted the police from the nearby home of her other son. Two East Hampton police officers responded to her call; they went to the house and spoke to the defendant, who refused to leave the house. Thereafter, the police researched the orders, and found the April order on file at police headquarters, although they had some doubts as to its validity. The following day, the police obtained an arrest warrant for the defendant.

Five police officers returned to 137 Wopowog Road the next day to arrest the defendant pursuant to the warrant. When another officer telephoned the defendant there and directed him to surrender to the incoming police officers, the defendant hung up the telephone during the conversation. When the officers arrived at the residence, they saw the defendant in the kitchen cutting meat with a large filleting knife. They told the defendant that they had an arrest warrant for him, but he refused to come out of the house. Using a key provided by the defendant's mother, the officers entered the house with weapons drawn and ordered the defendant to drop the knife. The defendant placed the knife on a nearby counter, but remained within reach of the knife—continuing to alternate looking at the officers and the knife. The defendant refused to comply with the officers' repeated directions to walk backward away from the knife. At that point, one officer sprayed the defendant with pepper spray and he began to scream

---

[30] The defendant and his mother had an argument in September, 1999, that led to a physical altercation between the two in which he struck her in the face. She told him to leave the house and not return, and the two have not spoken since that time.

and thrash around as they attempted to handcuff him. The defendant continued to curse and kick at the officers until one struck him on the back of the calf with a police baton. The defendant then became physically compliant and was transported to the police station.[31] On cross-examination, the defendant admitted disobeying the officers' directions as they executed the arrest warrant.[32]

During the proceedings, the defendant moved for a judgment of acquittal on the criminal trespass charges, contending that: (1) with respect to the charge based on the restraining order, the court should construe the restraining order as limited to six months; and (2) the state had produced insufficient evidence with respect to the charge based on his mother's statement that he was banned from the house. The state opposed the motion. The trial court denied the motion with respect to the restraining order personally communicated to the defendant, concluding that there was sufficient evidence to create a jury question, but granted the defendant's motion for acquittal with respect to the trespass charges based on the restraining order. The trial court concluded that "especially since it is an element of the crime I don't believe that there actually was a valid restraining order outstanding. There was a restraining order outstanding, but I don't believe it was a valid one, so I am going to grant a judgment of acquittal as to that count of criminal trespass." Thereafter, the defendant presented his defense, and the jury convicted him of

---

[31] The defendant asked the officers on cross-examination whether they had struck him in the face during the altercation; they denied doing so.

[32] The defendant also testified on his own behalf. He explained his troubled relationship with his mother, and stated that he only wished to see the officers' arrest warrant during the altercation. The defendant also testified that he never understood that he was to stay away from his mother's house, because "everything I own is in that house." He did admit that he did not have a key to the house and that in the past, he could retrieve his belongings only if he was escorted by another family member or a police officer.

one count of criminal trespass in the first degree in violation of § 53a-107 (a) (2), and two counts of interfering with an officer in violation of § 53a-167a (a).

After the jury's verdict was received, the trial court gave the defendant an option with respect to the scheduling of sentencing. He conferred with standby counsel and elected to be sentenced that same day. The state, citing the defendant's record of twenty prior criminal convictions, asked the court to impose the maximum possible sentence on all counts of three years. The defendant expressed his remorse for the effect of his actions on his family, and stated his desire to move on with his life. The trial court noted that imposing a consecutive sentence on the interfering with an officer counts might raise double jeopardy implications because they arose from the same conduct; see also part III of this opinion; and that the maximum available sentence was, therefore, two years. In discussing the various purposes of sentencing, the trial court discussed the defendant's criminal history and his history of psychological and substance abuse problems, and encouraged him to seek help.[33] The trial court discussed the defendant's conduct that gave rise to the charges, and sentenced him to a split sentence of two years, suspended after twenty months, followed by three years of probation with counseling as directed by probation, and an order to stay away from his mother and her home. The trial court determined that it wanted to keep some controls on the defendant after his release from

---

[33] We do note that the trial court mentioned the plea negotiations at this point, stating: "To have a family come in here and testify, your mother, your brother, your sister-in-law, they took no pleasure in testifying against you. *I mean, this was a case, I felt, that could have been worked out for a very, very reasonable disposition.* You wanted a trial that, clearly, was your right to have a trial . . . but you not only put yourself through a trial you put your family through this, which was difficult. Publicity on it, things in the newspaper about your mother testifying, I mean, I thought that was extremely sad." (Emphasis added.)

prison in order to provide him with a behavioral incentive and ensure that he is seeking the help he needs. The sentence ran consecutive to the defendant's sentence for probation violation, which had concluded the day after the trial.

Having reviewed the proceedings on these criminal charges, we conclude that the record demonstrates no manifest injustice requiring reversal under the plain error doctrine. First, the plea negotiations could not have colored the factual determinations because a jury was the fact finder, and, in any event, the facts were not discussed during plea negotiations. See footnote 4 of this opinion. Indeed, the defendant consented affirmatively to the trial court's presiding over the trial, despite the trial court's concerns with respect to the arrest warrant. Furthermore, the trial court granted the defendant's motion for acquittal with respect to the restraining order-based trespass charges, which was a decision that was different from the judge's preliminary assessment of the case during plea negotiations. See footnote 4 of this opinion. Moreover, during the trial, the court constantly was solicitous of the defendant by: (1) sua sponte offering him a break when he became upset while questioning his mother about his deceased father; (2) providing him with tissues and water when he became upset while testifying about the events that gave rise to his trespassing arrest; (3) explaining why it was permissible for the prosecutor to question him about the September, 1999 incident with his mother that gave rise to a restraining order; and (4) providing guidance with respect to various points of procedure, such as opportunities for rebuttal and the conduct of closing arguments.

Moreover, although the trial court would have been better advised not to have commented at sentencing about the "reasonable disposition" that previously had been offered to the defendant; see footnote 33 of this

opinion; the totality of the record demonstrates that the defendant received a fair trial and a reasonable sentence, both of which were not colored by judicial vindictiveness.[34] The trial court did not sentence the defendant to a maximum term of incarceration, but fashioned a thoughtful sentence that considered the defendant's extensive criminal history while maintaining an opportunity for the defendant to obtain mental health and substance abuse services in a structured, court supervised setting. Accordingly, the Appellate Court improperly concluded that it was plain error requiring reversal for Judge Clifford to preside over the defendant's trial.

## II

### ALTERNATE GROUND FOR AFFIRMANCE: WHETHER THE DEFENDANT KNOWINGLY AND INTELLIGENTLY WAIVED HIS RIGHT TO COUNSEL

The defendant posits, as an alternate ground for affirming the judgment of the Appellate Court, a claim that he proceeded pro se without making a knowing and intelligent waiver of his constitutional right to the assistance of counsel. Specifically, the defendant contends that the trial court, *Fischer, J.*, did not adequately canvass him pursuant to Practice Book § 44-3[35] on Feb-

[34] Indeed, we find most telling the defendant's failure on appeal to argue any examples of legal error with respect to the conduct of the trial, or any other manifest injustice beyond the *Niblack* violation.

[35] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

ruary 27, 2002, and that the defendant was, therefore, deprived of the assistance of counsel during plea bargaining and trial preparation. The defendant concedes that he did not raise this claim before the trial court, and requests review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40.[36] The state argues in response that both the February 27, 2002 canvass and the record as a whole demonstrate that, notwithstanding the trial court's failure to comply strictly with the prophylactic requirements of Practice Book § 44-3, the defendant's waiver of his right to counsel nevertheless satisfied the constitutional requirement that the waiver be knowing and voluntary. We conclude that the defendant's claim is reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, but we agree with the state that the defendant's waiver of counsel satisfied constitutional requirements.

The record reveals the following additional facts and procedural history. In December, 2001, the trial court, *Fischer, J.*, appointed a public defender to represent the defendant in both the criminal and probation violation matters. At proceedings conducted in January, 2002, the defendant expressed to the trial court, *Gordon, J.*, his desire to represent himself, and to be placed on the speedy trial list. The trial court discussed the defendant's wish with him, ordered a competency examination pursuant to General Statutes § 54-56d, and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

[36] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

continued the matter.[37] Thereafter, on February 27, 2002, the trial court, *Fischer, J.*, reviewed the competency report and found the defendant competent to represent himself.[38] The defendant reiterated his desire to proceed pro se, and to have the public defender withdraw from representing him. The trial court ascertained the degree of the defendant's education, warned

[37] At the pretrial proceedings before *Gordon, J.*, the following colloquy occurred:

"The Defendant: I'd like to go pro se on the case for sure. There's no way that we're going to be [able to] handle this with [the public defender] representing me.

"The Court: Well, that may be true. But before I'm going to let you go pro se, since you're facing time in jail, I've ordered that an examination be made of you to find out whether or not you're competent to either represent yourself or work with a lawyer, so that I know what to do.

"The Defendant: Well, I'm being charged with two class A misdemeanors, which carry a maximum of two years.

"The Court: Right.

"The Defendant: And I'm willing to sit and take this to a trial and I'd like to—

"The Court: Well, I understand that. But you have to understand that whatever you're willing to do, part of my job is to make sure that your constitutional rights are protected while you do it. And in order to do that, I need to know whether or not you are A, able to represent yourself or B, able to work with your lawyer. Okay? So I'm ordering that you be examined to make sure that you do that.

"Now, if it comes out that you are, then we'll probably accede to your wishes. But I need to do that first.

"The Defendant: Okay. Well, in the meantime, ma'am, I would like to be on the speedy trial list, please, so that—

"The Court: I can't do that orally. You'll have to make an application for a speedy trial. But I think the proceedings are stayed while the other matter's taking place, the examination's taking place. Okay? So I need to do that first. But you can send in your form, you can talk to one of the counselors at the jail. They'll help you in filling it out."

[38] The competency report reviewed the defendant's medical and psychological history and social background. The clinical competency panel concluded that the defendant "was able to understand the proceedings against him and assist in his defense." They noted that the defendant "had a solid understanding of the charges pending against him, the underlying allegations, and the legal system in general," and that the defendant "stated accurately" the exact charges, his plea options, and had "an advanced understanding of courtroom personnel and procedures."

him of the risks of proceeding pro se, and permitted the public defender to withdraw.[39] The trial court then

[39] After finding the defendant competent, the trial court, *Fischer, J.*, was apprised by the public defender that the defendant wished to renew his motion to discharge counsel and proceed pro se. The following colloquy then occurred:

"The Court: Is that what you want, sir?

"The Defendant: Yes, sir.

"The Court: You want to represent yourself?

"The Defendant: Yes, sir.

"The Court: Do you want to have your public defender withdraw from representing you?

"The Defendant: Well, I'd like to represent myself. If it would be in the court's better interest to have him standing next to me while I represent myself, then that'd be fine with me.

"The Court: Well, sir, I think it's in your best interest to have him represent you. He's a—

"The Defendant: I prefer to represent myself, sir. I'm the guy sitting in the jail, and I'll take care of that.

"The Court: And what's your request? That he stand next to you?

"The Defendant: No. No. That's—no. I said if that's—if that would help— if that would make the court feel better, then . . . .

"The Court: What's the next court date? What date are we using?

"[The Prosecutor]: It depends on what we're going to do. We can go two weeks, Your Honor.

"[The Public Defender]: I think he wants to try and do some more research. Is that?

"The Defendant: Yeah. I'd like to spend a little time in a legal library. I might need some documentation to bring back to the jail with me because they won't just let you go into the legal library without some documentation that I'll be representing myself. I've already tried, and they wouldn't allow me to.

"The Court: Have you ever represented yourself before?

"The Defendant: No, but I took a couple of legal classes in Manchester Community College, and I did complete high school, and, you know. Alls I know is my constitutional rights have been violated to a certain extent here, and I'm willing to go to trial to prove that.

"The Court: You have the absolute right to go to trial. My concern is that—and I know you've taken some legal courses, and you're a graduate, a high school graduate. The gentleman to your right has been practicing law, does this for a living. He's extremely competent, and I think you would be in much better hands and a much better position to have an attorney being your advocate on this case. I know I'm repeating myself, but I just want to make clear where you know where I'm coming from.

"The Defendant: No, I'll take care of myself here, sir.

"The Court: Okay. I'm going to allow [the public defender] to withdraw. So you're going to be representing yourself. You need to file a pro se

granted the defendant's request and continued the matter to March 20, 2002, so that the defendant could complete research on his case.

We begin with the applicable standard of review. We review the trial court's determination with respect to whether the defendant knowingly and voluntarily elected to proceed pro se for abuse of discretion. See, e.g., *State* v. *Bangulescu*, 80 Conn. App. 26, 43, 832 A.2d 1187, cert. denied, 267 Conn. 907, 840 A.2d 1171 (2003). Recognizing the constitutional implications attendant to *Golding* review, we do not review the proceedings for strict compliance with the prophylactic rule of Practice Book § 44-3, but rather for evidence that the waiver of counsel was made knowledgeably and voluntarily. See *State* v. *Webb*, 238 Conn. 389, 429, 680 A.2d 147 (1996) ("The defendant, however, does not possess a constitutional right to a specifically formulated canvass. His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish that the defendant's waiver was voluntary and knowing."); *State* v. *Gethers*, 193 Conn. 526, 540, 480 A.2d 435 (1984)

appearance. What date are we—and you need time to do research for this; is that correct?

"The Defendant: A little research.

"The Court: All right.

"Defendant: I've been having a hard time getting paperwork there also. There was a female judge on the bench, and I mentioned that I wanted to file a request for a speedy trial, and she sent me back to the jail and told me to write to the counselor, which I did. They told me to write to records. I wrote to records. I haven't gotten anywhere with the paperwork.

"The Court: Is three weeks enough time for you to do your research?

"The Defendant: It should be. Yes.

"The Court: All right. So we're going to see you back here on March 20th. That's three weeks from today. Get as much research done as you can, and we'll see you back on that day, and we'll address your situation on that day. Okay?

"[The Public Defender]: For the record, Your Honor, I'll provide him copies of the police reports and the § 54-56d report, copies of [the] letter he sent me, and also maybe our investigator will get a copy of the appearance that he files and help him file that."

("[o]nce it is determined that there has been a constitutionally valid waiver of counsel, a defendant cannot be denied his right to try his own case simply because of some insubstantial nonconformity with [Practice Book § 44-3]").

"The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . . *State* v. *Day*, 233 Conn. 813, 821, 661 A.2d 539 (1995).

"Practice Book § [44-3] was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . . *State* v. *Gethers*, [supra, 193 Conn. 532]. Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with § [44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. *State* v. *Day*, supra, 233 Conn. 822. Because the § [44-3] inquiry simultaneously triggers the constitutional right of a defendant to represent himself and enables the waiver of the constitutional right of a defendant to counsel, the provisions of § [44-3] cannot be construed to require anything more than is constitutionally mandated. Id.; *State* v. *Townsend*, 211 Conn. 215, 220, 558 A.2d 669 (1989); [*State* v.] *Gethers*, supra, 534.

"[A] defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . *Faretta* v.

*California,* [422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)]. Rather, a record that affirmatively shows that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver. Id.; [*State* v. *Gethers*], supra, [193 Conn.] 536. . . . *State* v. *Day,* supra, 233 Conn. 827–28. The nature of the inquiry that must be conducted to substantiate an effective waiver has been explicitly articulated in decisions by various federal courts of appeals. See, e.g., *United States* v. *Cash,* 47 F.3d 1083, 1088 (11th Cir. 1995) (court must inform defendant of charges, included offenses and possible range of punishment); *United States* v. *Hurtado,* 47 F.3d 577, 583 (2d Cir. 1995) (factors determining valid waiver include whether defendant understood that he had choice between proceeding pro se and with assigned counsel, understood advantages of having trained counsel, and had capacity to make intelligent choice) [cert. denied, 516 U.S 903, 116 S. Ct. 266, 133 L. Ed. 2d 188 (1995)]; *United States* v. *Van Krieken,* 39 F.3d 227, 229 (9th Cir. 1994) (defendant must be aware of nature of charges against him, possible penalties and disadvantages of self-representation) . . . .

"None of these authorities, however, stands for the proposition that a defendant must be specifically informed of the particular elements of the crimes charged before being permitted to waive counsel and proceed pro se. In fact, the Court of Appeals for the Ninth Circuit has stated that perfect comprehension of each element of a criminal charge does not appear to be necessary to a finding of a knowing and intelligent waiver. *United States* v. *Robinson,* 913 F.2d 712, 715 (9th Cir. 1990) [cert. denied, 498 U.S. 1104, 111 S. Ct. 1006, 112 L. Ed. 2d 1089 (1991)]. A discussion of the elements of the charged crimes would be helpful, and may be one of the factors involved in the ultimate determination of whether the defendant understands the

nature of the charges against him. A description of the elements of the crime is not, however, a sine qua non of the defendant's constitutional rights in this context. Indeed, in our cases we have approved of a defendant's assertion of the right to proceed pro se in a case in which the record did not affirmatively disclose that the trial court explained the specific elements of the crimes charged to the defendant as long as the defendant understood the nature of the crimes charged." (Citations omitted; internal quotation marks omitted.) *State v. Wolff*, 237 Conn. 633, 654–57, 678 A.2d 1369 (1996).

"The multifactor analysis of § [44-3], therefore, is designed to assist the court in answering two fundamental questions: first, whether a criminal defendant is minimally competent to make the decision to waive counsel, and second, whether the defendant actually made that decision in a knowing, voluntary and intelligent fashion. . . . As the United States Supreme Court recently recognized, these two questions are separate, with the former logically antecedent to the latter." (Citation omitted.) *State v. Day*, supra, 233 Conn. 822–23. Inasmuch as the defendant's competence is uncontested, we proceed to whether the trial court abused its discretion in concluding that the defendant made the waiver decision in a knowing, voluntary, and intelligent fashion.

Although the transcript of the February 27, 2002 canvass does not itself adhere strictly factor-by-factor to Practice Book § 44-3, we conclude that the record demonstrates that the defendant's waiver of counsel was knowing and voluntary.[40] Judge Fischer advised the

---

[40] We note the defendant's argument that that state already has conceded in the Appellate Court that the February 27, 2002 canvass satisfied neither the rules of practice nor the constitutional standards for waiver of the right to counsel. The state, however, contends in this court that the February 27, 2002 canvass satisfies constitutional standards, particularly when viewed in the context of the prior proceedings and the competency report. We will review the state's arguments because the Appellate Court decisions did not reach the waiver of counsel issue. See *State v. Chapman*, 229 Conn. 529,

defendant repeatedly of his right to the assistance of counsel, and the advisability of retaining an attorney given the disadvantage he would face relative to the trained prosecutor. See Practice Book § 44-3 (1) and (4); see also footnote 39 of this opinion. Indeed, Judge Clifford reiterated those admonitions during the plea negotiations. See footnote 4 of this opinion. Moreover, Judge Fischer relied properly on the competency report and his discussion with the defendant with respect to the defendant's high school education and community college law courses in determining that the defendant "[possessed] the intelligence and capacity to appreciate the consequences of the decision to represent oneself . . . ." Practice Book § 44-3 (2). The record also demonstrates substantial compliance with Practice Book § 44-3 (3), namely, whether the defendant "[comprehended] the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case . . . ." The trial court reasonably relied on the competency report; see footnote 38 of this opinion; for the defendant's comprehension of the charges and proceedings, as well as the defendant's awareness and understanding of procedural devices such as speedy trial motions. See *State* v. *Bangulescu*, supra, 80 Conn. App. 46 (trial court properly relied on competency report describing defendant's awareness of pending charges and possible penalties, as well as his defense strategy and his "adequate understanding of the nature of judicial proceedings as

536 n.5, 643 A.2d 1213 (1994) (declining to permit state to modify its concession before Appellate Court that jury instruction was improper when Appellate Court decision under review relied on that concession, and issue was whether Appellate Court should have applied harmless error analysis). Accordingly, because our focus is on the February 27, 2002 canvass, which satisfied constitutional requirements, we also find the defendant's reliance on *State* v. *Cohens*, 62 Conn. App. 345, 352, 773 A.2d 363, cert. denied, 256 Conn. 918, 774 A.2d 139 (2001), misplaced, because that decision merely held that a defendant was deprived of the right to counsel when the trial court did not obtain his waiver until the second day of jury selection.

well as the roles of the courtroom personnel and court-room procedures"). Indeed, we also note that the defendant cited, without prompting, the charges pending against him in the initial January colloquy during the pretrial proceedings before Judge Gordon. See footnote 37 of this opinion. Accordingly, we conclude that the trial court did not abuse its discretion in concluding that the defendant knowingly and intelligently waived his right to counsel and proceeded pro se.[41]

## III

### WHETHER THE DEFENDANT'S TWO INTERFERING WITH AN OFFICER CONVICTIONS ARE A DOUBLE JEOPARDY VIOLATION

The defendant's final claim is that his two interfering with an officer convictions violate federal and state

[41] We discuss briefly the defendant's claim that his choice was not a knowledgeable one because the trial court improperly failed to inquire at the February 27, 2002 canvass as to whether the defendant wanted a different appointed attorney. We conclude that this claim lacks merit, as this defendant, who was not shy about asserting his rights while proceeding pro se, did not ask the trial court for substitute counsel at any time, instead emphasizing his desire to proceed pro se. Moreover, it is well settled that "a criminal defendant does not have the right to have the public defender of his choice." *State* v. *Oliphant*, 47 Conn. App. 271, 278–79, 702 A.2d 1206 (1997) ("[a]s long as the defendant clearly and unequivocally indicates that he wants to proceed pro se instead of proceeding with the public defender appointed for him, his waiver of counsel is knowing and voluntary"), cert. denied, 244 Conn. 904, 714 A.2d 3 (1998); see also *United States* v. *Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990) ("The right to counsel of *choice*, unlike the *right* to counsel, however, is not absolute. An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." [Emphasis in original.]); *People* v. *Burton*, 48 Cal. 3d 843, 855, 771 P.2d 1270, 258 Cal. Rptr. 184 (1989) ("[T]here is no basis in the record for the view the court should have realized [the] defendant was making a motion, not to represent himself, but to substitute counsel. Although [the] defendant expressed dissatisfaction with his attorney, he made repeated, explicit requests to represent himself and gave reasons why he thought he would be more persuasive and effective than counsel. He never suggested he would like a different attorney. . . . Nor is it the rule that whenever a defendant makes a motion to represent himself on the basis of dissatisfaction with counsel, the court automatically should inquire whether he would like to make a motion for substitution of

constitutional protections against double jeopardy.[42] Specifically, he argues that he has been convicted twice for the same offense, and that the trial court incorrectly permitted both convictions to stand, despite the imposition of concurrent sentences. Accordingly, the defendant asks for the convictions to be combined into a single conviction pursuant to *State* v. *Chicano*, 216 Conn. 699, 724–25, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). The state, relying on *State* v. *Jenkins*, 40 Conn. App. 601, 672 A.2d 969, cert. denied, 237 Conn. 918, 676 A.2d 1374 (1996), and *State* v. *Lytell*, 206 Conn. 657, 539 A.2d 133 (1988), contends in response that the two convictions are valid because each charge was directed to different officers and different conduct. This claim was not raised before the trial court, and we review it pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. See also footnote 36 of this opinion.

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Chicano*, supra, 216 Conn. 706. "It is well settled that [t]he proper double jeopardy inquiry when a defendant is convicted of multiple violations of

counsel." [Citation omitted.]), cert. denied, 494 U.S. 1039, 110 S. Ct. 1502, 108 L. Ed. 2d 637 (1990).

[42] "The fifth amendment to the United States constitution provides in relevant part: 'No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . .' The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). 'Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of article first, § 9, include protection against double jeopardy.' " *State* v. *Colon*, 272 Conn. 106, 293–94, 864 A.2d 666 (2004).

the same statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute. . . . As we noted in *State* v. *Madera*, 198 Conn. 92, 109, 503 A.2d 136 (1985), the issue, though essentially constitutional, becomes one of statutory construction. We have recently interpreted a number of criminal statutes to determine the same issue: whether the legislature intended to allow punishment for two separate violations of the same statutory provision. . . . In these cases, we found that the pivotal question was whether the statutes defined crimes against the individual persons." (Citations omitted; internal quotation marks omitted.) *State* v. *Lytell*, supra, 206 Conn. 665–66; see also id., 667 (upholding two convictions for single robbery of two victims because "the plain language of [General Statutes] § 53a-133 clearly mandates punishment for each and every robbery of each and every person, irrespective of whether the robbery was spatially linked with another robbery").

The defendant's claim is controlled by the Appellate Court's decision in *State* v. *Jenkins*, supra, 40 Conn. App. 602–603, wherein three police officers attempted to apprehend a defendant as the suspect in an attempted carjacking. "The defendant pushed two officers away and attempted to flee. All three officers pursued the defendant until [Officer R] tackled the defendant. The defendant struggled with the three officers and attempted to grab [Officer R's] gun. During the struggle, [Officer R] sustained a painful cut on his elbow. At some point during the struggle, [Officer N] informed the defendant that he was under arrest. While being taken to a police vehicle, the defendant, by wrapping his legs around a signpost, further hindered [Officer N]. [Officer N] and [Officer R] forcibly removed the defendant from the post and placed him in the police vehicle. Once inside the vehicle, the defendant repeat-

edly struck his head against a window." Id., 603. The defendant was convicted of, inter alia, interfering with an officer and assault of a peace officer. Id., 602. The Appellate Court concluded that, although interfering with an officer is a lesser included offense of assault of a peace officer, the two separate convictions did not violate the double jeopardy clause because, although "the charges arose out of the same transaction, the sole issue is whether the crimes constitute the same offense." Id., 611. The Appellate Court followed this court's decision in *State* v. *Lytell*, supra, 206 Conn. 666, noting that "[w]here crimes against persons are involved, a separate interest of society has been invaded for each violation. Therefore when two or more persons are the victims of a single episode there are as many offenses as there are victims." (Internal quotation marks omitted.) *State* v. *Jenkins*, supra, 612. The court stated that the statutes used the word "officer" in the singular, and quoted *Lytell* for the proposition that "there is no indication that the defendant can get a bargain rate . . . when two officers are involved." (Citation omitted; internal quotation marks omitted.) Id., 613, quoting *State* v. *Lytell*, supra, 667. The court concluded that the interfering with an officer and assault of a peace officer statutes, therefore, "authorize punishment for separate violations against each officer, regardless of whether the violations were spatially linked." *State* v. *Jenkins*, supra, 613.

In the present case, the information charged and the defendant was convicted of two violations of § 53a-167a (a), that while arising from the same general series of events, indeed within minutes of each other, nevertheless were based on two distinct acts involving different officers: (1) refusing to surrender peacefully when he was told by telephone that the officers had an arrest warrant for him; and (2) refusing the order to walk away from the knife toward the officers and kicking

and thrashing during the arrest. See also part I D of this opinion. Accordingly, we follow *Jenkins* and *Lytell*, and we conclude that the defendant's constitutional protections against double jeopardy were not violated.[43]

The judgments of the Appellate Court are reversed, and the cases are remanded to that court with direction to affirm the judgments of the trial court in case SC 17096 and case SC 17095.

In this opinion BORDEN, PALMER, VERTEFEUILLE and ZARELLA, Js., concurred.

KATZ, J., with whom, SULLIVAN, C. J., joins, dissenting. In reversing the judgments of conviction rendered against the defendant, Louis D'Antonio, and remanding the cases for a new trial, the Appellate Court reasoned that "[t]he record discloses that during the plea negotiations, the [trial] court itself understood that it had participated actively in such a way as to make clear that a different judge would necessarily preside over the defendant's trial and sentencing. Although it seems unlikely, on the basis of the record, that at the time of the trial, the court recalled the nature of its previous involvement, we need not find, nor do we find, actual bias or prejudice on the part of the court. . . .

---

[43] In *State* v. *Flynn*, 14 Conn. App. 10, 20, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988), which was cited by the defendant, the Appellate Court concluded that "the crimes of interference with an officer and assault on an officer constitute the same offense and because there is no expression of legislative intent that the crimes warrant separate punishment, the defendant's conviction on both counts one and four [of the information] violated the constitutional and common law prohibitions against double jeopardy." Although *Flynn* also involved multiple police officers, it is distinct from both the present case and *Jenkins* because, in that case "neither the information nor the court's jury instructions specified what act was alleged to constitute a violation of which statute. The information states the exact same place and time in connection with all four crimes, and is silent with respect to any particular act which violates any particular statute. We must therefore conclude that, for the purpose of double jeopardy analysis, the crimes charged arose out of the same act or transaction." Id., 17.

Because the court presided over the trial and sentencing after having participated actively in plea negotiations, the appearance of a fair trial was lost." (Citations omitted.) *State* v. *D'Antonio*, 79 Conn. App. 696, 707–708, 830 A.2d 1196 (2003); accord *State* v. *D'Antonio*, 79 Conn. App. 683, 694, 830 A.2d 1187 (2003). The Appellate Court, therefore, concluded "that the existence of impartiality might reasonably be questioned and the fairness and integrity of and public confidence in the judicial proceeding affected when a court presides over the trial and sentencing after participating actively in plea negotiations. In this case, the appearance of a fair trial has been lost and a new trial is warranted." *State* v. *D'Antonio*, supra, 79 Conn. App. 696; *State* v. *D'Antonio*, supra, 79 Conn. App. 710. I agree with the well reasoned decision by the Appellate Court concluding that the trial court committed plain error when it presided over the defendant's probation revocation hearing, his trial and his sentencing after having participated actively in plea negotiations with the defendant.[1]

---

[1] I am somewhat confused by the majority opinion in this case, which essentially determines that the defendant's claim is subject to plain error review, but not reversal. "[T]he plain error doctrine, which is now codified at Practice Book § 60-5 . . . is not . . . a rule of reviewability. It is a rule of *reversibility*. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy." (Emphasis added; internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 343 n.34, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). In addition, the plain error doctrine "is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Toccaline*, 258 Conn. 542, 552–53, 783 A.2d 450 (2001). "Implicit in this very demanding standard is the notion, explained previously, that invocation of the plain error doctrine is reserved for occasions *requiring* the reversal of the judgment under review." (Emphasis added.) *State* v. *Kirk R.*, 271 Conn. 499, 507 n.14, 857 A.2d 908 (2004); id. ("because the defendant's claim does not mandate a reversal of the trial

In Connecticut, "[i]t is a common practice . . . for the presiding criminal judge to conduct plea negotiations with the parties. If plea discussions ultimately do not result in a plea agreement, the trial of the case is assigned to a second judge who was not involved in the plea discussions and who is unaware of the terms of any plea bargain offered to the defendant. The judge responsible for trying the case also is responsible for sentencing the defendant in the event the defendant is convicted after trial." *State* v. *Revelo*, 256 Conn. 494, 508 n.25, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001). "[A]s long as the defendant is free to reject the plea offer [made after negotiations conducted by one judge] and go to trial before a [second] judge who was not involved in or aware of those negotiations, [the defendant] is not subject to any undue pressure to agree to the plea agreement, and the impartiality of the judge who will sentence him in the event of conviction after trial is not compromised."[2] (Internal quotation marks omitted.) Id., 507–508, quoting *Safford* v. *Warden*, 223 Conn. 180, 194 n.16, 612 A.2d 1161 (1992); see, e.g., *State* v. *Falcon*, 68 Conn. App. 884, 889, 793 A.2d 274 (reversing judgment even absent prejudice), cert. denied, 260 Conn. 924, 797 A.2d 521(2002); *State* v. *Washington*, 39 Conn. App. 175, 182, 664 A.2d 1553 (1995) (same). Therefore,

---

court's judgment, the present case is not an appropriate occasion in which to invoke the plain error doctrine"). As I state in this dissenting opinion, the defendant's unpreserved recusal claims not only should be reviewed, but the judgments also must be reversed.

Because I dissent to part I of the majority opinion and would affirm the judgment of the Appellate Court, I do not address the defendant's alternate grounds for affirming the judgment of the Appellate Court discussed in parts II and II of the majority opinion.

[2] In recognition of the potential for undue pressure, "many jurisdictions bar judges from active participation in plea negotiations." *State* v. *Revelo*, supra, 256 Conn. 506; see id., 506 n.22 (citing Fed. R. Crim. P. 11 [e] [1]; Colo. Rev. Stat. § 16-7-302 [1] [2000]; Wash. Rev. Code Ann. § 9.94A.080 [West 1998]).

although we recognize that pretrial or plea negotiations play a critical role in the criminal justice system, and the disposition of charges after plea discussions is highly desirable; see *State* v. *Revelo*, supra, 505; we also recognize that the legitimacy of that process and the integrity of the trial immediately become suspect when both proceedings are conducted by the same judge.

Thus, this court previously has recognized that "[c]anon [3 (c) (1)] of the Code of Judicial Conduct *requires* a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . . Even in the absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 460–61, 680 A.2d 147 (1996). The obligation of disqualification, therefore, rests in the first instance with the judge when his or her participation in a matter would violate canon 3 (c) or General Statutes § 51-39.[3] This obligation imposes a *per se* rule, which may be excused only upon the parties' consent.[4]

---

[3] General Statutes § 51-39 (c) provides: "When any judge or family support magistrate is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court."

[4] We have recognized that the disqualification can be waived, thereby allowing the judge to preside, when the judge obtains the parties' consent to his participation in open court pursuant to § 51-39 (c). By reaching the question of whether the trial court in this case committed "per se plain error requiring reversal," the majority implicitly has concluded that the waiver provisions of § 51-39 are inapplicable.

The majority recognizes that it was improper for the judge to preside over the trial and sentencing after having participated actively in plea negotiations, but it further concludes that the defendant must demonstrate that he was thereby harmed. I agree with the Appellate Court, however, that, in light of canon 3 (c), the trial court's conduct necessarily gives rise to a circumstance in which "the existence of impartiality might reasonably be questioned and the fairness and integrity of and public confidence in the judicial proceeding affected . . . ." *State* v. *D'Antonio,* supra, 79 Conn. App. 710; accord *State* v. *Falcon,* supra, 68 Conn. App. 889. Accordingly, I would conclude that harmless error analysis is inappropriate because the trial judge's failure to disqualify himself constituted a structural error.

"Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Internal quotation marks omitted.) *State* v. *Lopez,* 271 Conn. 724, 733–34, 859 A.2d 533 (2004).

"When the error undermines the structural integrity of the tribunal, no review for harmless error or prejudice to the defendant need be made. Such an error can never be harmless and automatically calls for reversal and a new trial. See *Chapman* v. *California,* 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). For example, an automatic reversal is required when the judge has

a financial interest in the outcome of a trial despite the lack of any indication that his bias affected the outcome; *Tumey* v. *Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927); or when there is a systematic exclusion from a grand jury of blacks; *Vasquez* v. *Hillery*, 474 U.S. 254, 263–64, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986); or when a defendant has been denied the assistance of counsel; *Glasser* v. *United States*, 315 U.S. 60, 76, 62 S. Ct. 457, 86 L. Ed. 680 (1942); or when inherently adverse publicity has tainted the trial; *Sheppard* v. *Maxwell*, 384 U.S. 333, 351–52, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); or when there exists purposeful discrimination in the selection of jurors. *Whitus* v. *Georgia*, 385 U.S. 545, 549–50, 87 S. Ct. 643, 17 L. Ed. 2d 599 (1967). These cases do not involve trial error occurring during the presentation of the case to the jury but involve extrinsic factors not occurring in the courtroom. Nor do they require any showing of prejudice to the defendant. These cases recognize that violation of some constitutional rights, such as the right to a trial by an impartial jury, may require reversal without regard to the evidence in the particular case. This type of structural error renders a trial fundamentally unfair and is not susceptible to a harmless error analysis; see *Rose* v. *Clark*, 478 U.S. 570, 577–78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986); or an analysis based on prejudice to a defendant. See *State* v. *Booth*, 250 Conn. 611, 649, 737 A.2d 404 (1999) [cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000)]. A harmless error analysis presupposes a trial at which a defendant is represented by counsel, and evidence and argument are presented in the courtroom before an impartial judge and jury. *Rose* v. *Clark*, supra, 578. When a structural error analysis is undertaken and such an error exists, the proceeding is vitiated. See *Arizona* v. *Fulminante*, [499 U.S. 279, 309–310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)]; *State* v. *Cruz*, 41

Conn. App. 809, 811, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996); *State* v. *Suplicki*, 33 Conn. App. 126, 130, 634 A.2d 1179 (1993), cert. denied, 229 Conn. 920, 642 A.2d 1216 (1994)." *State* v. *Anderson*, 55 Conn. App. 60, 72–74, 738 A.2d 1116 (1999), rev'd, 255 Conn. 425, 773 A.2d 287 (2001); see *State* v. *Anderson*, supra, 255 Conn. 448 (concluding no structural defect existed under circumstances of particular case).

The majority does not dispute that, when we have addressed claims regarding the active participation in plea bargaining by the judge responsible for presiding over the case and for sentencing the defendant in the event of a conviction, we have underscored the inappropriateness of such conduct due to its inherent dangers. *State* v. *Revelo*, supra, 256 Conn. 494; *Safford* v. *Warden*, supra, 223 Conn. 194 n.16; *State* v. *Niblack*, 220 Conn. 270, 280, 596 A.2d 407 (1991); *State* v. *Gradzik*, 193 Conn. 35, 47, 475 A.2d 269 (1984). Among "[t]hose dangers are that (1) the trial judge's impartiality may truly be compromised by his [or her] own perception of a personal stake in the agreement, resulting in resentment of the defendant who rejects [the judge's] suggested disposition, (2) the defendant may make incriminating concessions during the course of plea negotiations, and (3) the trial judge may become or appear to become an advocate for his [or her] suggested resolution." (Internal quotation marks omitted.) *State* v. *Revelo*, supra, 506 n.23.

In light of such dangers, when error calls into question the objectivity of those charged with bringing a defendant to judgment, we as a reviewing court can neither indulge a presumption of regularity nor necessarily evaluate the resulting harm. Although we have a record of the trial proceedings, pretrial proceedings usually are conducted off the record and in the defendant's absence, and plea bargains that are rejected generally are not made a part of the record. Therefore, in

deciding whether the defendant can demonstrate the harm, only one side of the equation is open for inspection. In order to evaluate with any degree of confidence whether the concerns associated with the active participation in plea bargaining by the judge responsible for the trial have indeed materialized, the proceedings in their entirety would have to be open for inspection. Because they are not, the legitimacy of the process is called into question. Accordingly, this defect involves the framework of the proceedings, and I am not prepared to indulge in presumptions of fairness.

Finally, I recognize the weight of authority to the contrary, but I am not persuaded. I fear that the path those jurisdictions follow ultimately could lead to an absolute ban on judicial participation in plea negotiations that the federal courts impose to ensure the appearance of judicial impartiality. See footnote 2 of this dissenting opinion. In my view, the value of having trial judges participating in plea negotiations is too great to risk such a remedy.

I recognize that, in the vast majority of cases, we require defendants whose rights have been violated during the course of a trial to make a specific showing of harm or prejudice. To do that in this case, however, would undermine the very purpose and nature of the structural error doctrine because the defect, in and of itself, by virtue of canon 3 (c), renders the trial process suspect.[5] "The broad injunction against the 'appearance of impropriety' relates to the entire spectrum of judicial

---

[5] I further recognize that we treat structural error as constitutional error not subject to a harmless error analysis and that the error in this case is not constitutional. I nevertheless conclude that, because the nature of the defect involves consequences that are necessarily unquantifiable and indeterminate, the impropriety of presiding over the defendant's probation revocation hearing, his trial and his sentencing after having participated actively in plea negotiations with the defendant unquestionably qualifies as structural error.

conduct. That no unethical or untoward act may occur is implicit in the canon's emphasis on 'appearance.' The conduct under scrutiny must therefore be evaluated from the perspective of the 'eye of the beholder.' *In the Matter of Lonschein*, 50 N.Y.2d 569, 572, 408 N.E.2d 901, 430 N.Y.S.2d 571 (1980). Avoiding the appearance of impropriety is as important to developing public confidence in the judiciary as avoiding impropriety itself." *In re Dean*, 246 Conn. 183, 198, 717 A.2d 176 (1998). For this reason, because structural errors are defects affecting the trial's entire framework, "[e]rrors of this magnitude are per se prejudicial and require that the underlying conviction be vacated." *Lainfiesta* v. *Artuz*, 253 F.3d 151, 157 (2d Cir. 2001), cert. denied sub nom. *Lainfiesta* v. *Grenier*, 535 U.S. 1019, 122 S. Ct. 1611, 152 L. Ed. 2d 625 (2002); see also *Sullivan* v. *Louisiana*, 508 U.S. 275, 280–81, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (harm resulting from erroneous jury instruction on definition of reasonable doubt impossible to quantify because court can only speculate what properly charged jury might have done); *Vasquez* v. *Hillery*, supra, 474 U.S. 263–65 (harm resulting from racial discrimination in grand jury cannot be quantified because impossible to know whether decision to indict would have been assessed same way by properly constituted grand jury); *Waller* v. *Georgia*, 467 U.S. 39, 49 n.9, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (harm resulting from denial of right to public trial unquantifiable because benefits of public trial are intangible, virtually impossible to prove); *State* v. *Murray*, 254 Conn. 472, 497–99, 757 A.2d 578 (2000) (harm resulting from improper substitution of alternate juror for excused juror after deliberations had begun impossible to quantify because court cannot ascertain whether jurors would be capable of disregarding prior deliberations and receiving potentially nonconforming views of alternate juror).

I agree with the Appellate Court that, "[b]ecause the court presided over the trial and sentencing after having

participated actively in plea negotiations, the appearance of a fair trial was lost." *State* v. *D'Antonio,* supra, 79 Conn. App. 708. Accordingly, I respectfully dissent.